In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3352

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN CASTELAN,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 888--James B. Moran, Judge.


Argued June 14, 2000--Decided July 27, 2000


Before CUDAHY, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.  In February 1998, a grand jury charged defendant Juan Castelan and three codefendants with various drug crimes. During Castelan's trial, the district court, relying on Federal Rule of Evidence 804(b)(3), allowed the government to introduce over objection the post-arrest statements of codefendant Ruben Olivares, who refused to testify as a government witness even after being immunized. A jury found Castelan guilty of one count of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. sec.sec. 846, 841(a)(1), and two counts of possession with intent to distribute cocaine, 21 U.S.C. sec. 841(a)(1), and the district court sentenced him to concurrent 120-month terms of imprisonment. Castelan now appeals, arguing that the admission of Olivares's post-arrest statements violated his rights under the Confrontation Clause of the Sixth Amendment. For the reasons stated herein, we affirm.

I.  BACKGROUND

    DEA Special Agent George Karountzos, posing as "Frank," initiated two undercover narcotics purchases that culminated in the arrest of Castelan, Olivares, and two other codefendants, Juan Garcia-Sandoval and Carlos Nina-Hernandez. According to the government's theory of the case, Karountzos negotiated his purchases of cocaine

through Olivares; Olivares in turn contacted Castelan, who procured the cocaine from Garcia-Sandoval. Nina-Hernandez was not directly involved with the distribution of the cocaine to Agent Karountzos, but agreed to provide security for one drug transaction.

The first cocaine buy was initiated when "Frank" called Olivares on December 17, 1997, and asked for one kilogram of cocaine, which the two men referred to as a "truck." Olivares told "Frank" to call back the next morning. When Agent Karountzos called Olivares the next morning, Olivares informed "Frank" that he was meeting with his suppliers at 12:30 PM. At 12:52 PM, Olivares phoned "Frank" and stated that he had spoken to the "guy" who was going to provide the "truck." Olivares related that "this guy is calling his, his employee," who would "bring the truck to us." At 1:05 PM, Olivares phoned "Frank" and told him that he would turn over the "truck" at an Amoco gas station located on the corner of Cicero and Foster at 2:15 PM./1

At 2:10 PM, Agent Karountzos met Olivares at the Amoco gas station. Olivares informed "Frank" that he did not have the cocaine with him. Olivares asked "Frank" to follow him to another location where the cocaine was located. Agent Karountzos refused to leave the gas station, citing concerns for his personal security. At around 2:40 PM, Olivares left the gas station to pick up the cocaine. Approximately ten minutes later, Olivares returned to the gas station, entered "Frank's" vehicle, and handed him a bag containing one kilogram of cocaine. In return, "Frank" paid $20,000 to Olivares./2

On December 27, 1997, Agent Karountzos phoned Olivares to arrange the purchase of six kilograms of cocaine. At 5:13 PM on December 29, 1997, Agent Karountzos telephoned Olivares to finalize the deal. Olivares stated that his suppliers had just called him and said they could deliver the cocaine on the following morning./3

Nina-Hernandez, who had agreed to provide security for the cocaine sale, testified that Olivares picked him up between 9:00 AM and 9:30 AM on December 30, 1997. Olivares then drove Nina-Hernandez to an apartment building located at 6610 North Sheridan and told him to wait in the lobby while he picked up Castelan. After Olivares returned with Castelan, he told Nina-Hernandez that he was to take Castelan to a gas station located at Bryn Mawr and Sheridan, where Castelan would meet up with the driver of another car. At the gas station, Nina-Hernandez was to give Castelan a garage door opener that would unlock the gate to the parking garage behind 6001

North Sheridan. Olivares informed Nina-Hernandez that, after he gave Castelan the garage door opener, he and Castelan were to drive separately to 6001 North Sheridan and park in designated parking spaces. Olivares instructed Nina-Hernandez to confirm that the area was clear after he and Castelan parked in the garage, and then signal Castelan that it was safe to deliver the cocaine.

After he and Castelan received their instructions from Olivares, Nina-Hernandez drove Castelan to the designated gas station. At the gas station, Castelan got into a Mercury Cougar driven by Garcia-Sandoval. After Nina-Hernandez left the gas station, he realized he had not given Castelan the garage door opener, so he pulled over and waited for the Cougar to pass. He then followed the Cougar to the parking garage at 6001 North Sheridan and activated the garage door. Rather than following the Cougar into the garage, Nina-Hernandez "got scared" and parked on a nearby side street. He was arrested a short time later by DEA agents. DEA agents located the Cougar in the parking garage, still occupied by Castelan and Garcia-Sandoval. After arresting Castelan and Garcia-Sandoval, DEA agents searched the Cougar and found six kilograms of cocaine located in two hidden compartments. At approximately the same time that Castelan and Garcia-Sandoval were arrested in the parking garage, DEA agents arrested Olivares inside the lobby of 6001 North Sheridan where he was waiting with "Frank" for the cocaine to be delivered./4

After he was arrested, Olivares was interviewed and implicated the others. During the interview, Olivares specifically asked what the DEA could do for him. On February 12, 1998, a grand jury charged Castelan, Olivares, Nina-Hernandez, and Garcia-Sandoval with conspiracy to distribute cocaine and possession with intent to distribute cocaine. Olivares and Nina-Hernandez negotiated plea agreements and agreed to testify against Castelan./5 But after entering his guilty plea, Olivares refused to testify as required, even after being granted immunity by the district court. On the theory that Olivares was no longer "available" to testify and his statements were against penal interest, the government moved under Rule 804(b)(3) to introduce statements he made during two post-arrest interviews with DEA agents. The district court found Olivares's statements to be reliable and granted the motion over Castelan's objection. The government then introduced Olivares's statements through the testimony of Owen Putman, one of the DEA agents who conducted the post-arrest interviews. Agent Putman testified that Olivares admitted his role in setting up the two cocaine deals on December

17 and December 30, 1997, and that he identified Castelan as the source of the cocaine. According to Putman, Olivares stated that after the first transaction on December 17, he met Castelan at the El Ranchito restaurant, where they counted the money for the kilogram of cocaine. Putman also testified about Olivares's statements describing Castelan's and Nina-Hernandez's respective roles in the December 30 deal and his telephone conversations with Castelan to finalize delivery of the six kilograms of cocaine.

After the jury found him guilty on all counts, Castelan moved for a new trial under Federal Rules of Criminal Procedure 29, 32, and 34, raising numerous grounds for relief, among them the district court's decision to admit Olivares's post-arrest statements. The district court denied his motion, but Castelan appeals only the admission of Olivares's post-arrest statements, which he contends violated the Confrontation Clause of the Sixth Amendment.

## II. DISCUSSION

We review de novo an evidentiary ruling that affects a defendant's Sixth Amendment right to confront witnesses, see United States v. Scott, 145 F.3d 878, 888 (7th Cir. 1998), and "'independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the [Confrontation] Clause,'" see United States v. Robbins, 197 F.3d 829, 837-38 (7th Cir. 1999) (quoting Lilly v. Virginia, 527 U.S. 116, 137 (1999)). A violation of the Confrontation Clause is subject to harmless error analysis. See Scott, 145 F.3d at 888.

The district court admitted Olivares's statements under Rule 804(b)(3),/6 which allows for the admission of statements against penal interest if the declarant is unavailable. Determining whether codefendant testimony admitted under Rule 804(b)(3) violates the Confrontation Clause normally requires a threshold determination of whether the evidence was properly admitted under Rule 804(b)(3) in the first instance. The Supreme Court has held that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made in a broader narrative that is generally self-inculpatory." United States v. Williamson, 512 U.S. 594, 600-01 (1994). Under Williamson, the district court must consider whether each statement, not just the confession as a whole, was truly self-inculpatory. See id. at 604. Here, the record is silent on whether the district court considered whether each statement by Olivares introduced at trial was genuinely self-inculpatory, and certainly the government never

urged the district court to parse Olivares's individual statements as Williamson required. Thus, it is not evident whether Olivares's post-arrest statements were properly admitted under Rule 804(b)(3) in the first instance. Castelan, however, does not argue that the statements were inadmissible under Rule 804(b)(3). He argues only that the admission of Olivares's statements violated his rights under the Confrontation Clause, citing Lilly. Thus, we will assume for purposes of this opinion that Olivares's post-arrest statements were properly admitted under Rule 804(b)(3) and turn our attention to the issue of whether the admission of Olivares's post-arrest statements violated the Confrontation Clause.

In Lilly, a plurality of the Supreme Court concluded that under the Confrontation Clause post-arrest statements made by a nontestifying accomplice that inculpate a defendant cannot be admitted against that defendant unless the government demonstrates that the statements bear "particularized guarantees of trustworthiness." See 527 U.S. at 136. "The residual 'trustworthiness' test credits the axiom that a rigid application of the [Confrontation] Clause's standard for admissibility might in the exceptional case exclude a statement of an unavailable witness that is incontestably probative, competent, and reliable, yet nonetheless outside of any firmly rooted exception." Id. The guarantees of trustworthiness must be inherent in the circumstances of the testimony itself; the fact that other evidence corroborates the testimony in question does not suffice. See id. at 138.

Here, the government asserts that Olivares's post-arrest statements are inherently trustworthy because Olivares "did not shift blame from himself or minimize his role" in making the statements. Thus, the Government contends that the statements declared unreliable in Lilly are distinguishable because the defendant in Lilly attempted to shift much of the criminal liability onto his codefendants. In response, Castelan argues that Olivares's statements are unreliable because they were made to law enforcement officers during a custodial interview, in which Olivares inquired whether he would receive any benefit for his cooperation.

In Lilly, the plurality stated, "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when . . . the government is involved in the statements' production, and when the statements describe past events and have not been subjected

to adversarial testing." Id. at 137. Since Lilly was decided, no circuit has yet determined if--and under what circumstances--an accomplice's custodial confession implicating a defendant can ever be deemed to possess sufficient inherent indicia of trustworthiness to satisfy the Confrontation Clause./7 Thus, the full scope of Lilly remains undefined. At least one treatise has explained that in Lilly "all nine justices of the Supreme Court indicated, more or less explicitly, that the admission of custodial statements to law enforcement personnel against penal interest . . . whether or not constituting a confession, that incriminate another person violates the confrontation clause when admitted against such other person in a criminal case." See 31 Charles Alan Wright, Arthur R. Miller, & Michael H. Graham, Federal Practice and Procedure sec. 6742 (2d ed. 2000).

Here, the fact that Olivares's confession was made to law enforcement officers during a custodial interview is but one factor implicating the reliability of his statements. Of equal significance is a DEA agent's statement during Olivares's interview that "he could help himself by cooperating with the agents," and Olivares's attempt to then "press[ ]" the agent on "what could be done to help him." Olivares was not given any explicit offers of leniency, but was told that the agents would report any assistance he provided to the prosecutors and judge assigned to the case.

Though the exchange between Olivares and the interviewing agents reveals a motive for Olivares to implicate Castelan, the district court held that Olivares's statements were nonetheless reliable because Olivares was not "trying to minimize his own position or his own involvement by thrusting upon another." But as the plurality noted in Lilly, the non-self-inculpatory parts of a confession are not rendered more credible simply because the confessor broadly inculpates himself as well. See 526 U.S. at 138-39. "'One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems persuasive because it is self-inculpatory.'" Id. at 133 (quoting Williamson, 512 U.S. at 599-600). Because Olivares's post-arrest statements were made in custodial interviews with law enforcement officials in which Olivares specifically inquired as to the benefits of his cooperation with authorities, we conclude that the statements lack inherent particularized guarantees of trustworthiness sufficient to satisfy the Confrontation Clause given the plurality opinion in Lilly.

Having concluded that the admission of

Olivares's post-arrest statements violated the Confrontation Clause, we turn to the issue of harmless error. See Delaware v. Van Ardsall, 475 U.S. 673, 684 (1986) (holding that harmless error analysis applies to Confrontation Clause errors). The Supreme Court has held that an otherwise-valid conviction should not be set aside if the constitutional error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." United States v. Eskridge, 164 F.3d 1042, 1044 (7th Cir. 1998) (quoting Schneble v. Florida, 405 U.S. 427, 432 (1972)). Whether an error is harmless beyond a reasonable doubt depends upon factors such as 1) the importance of a witness's testimony in the prosecution's case, 2) whether the testimony was cumulative, 3) the presence or absence of corroborating or contradictory evidence, and 4) the overall strength of the prosecution's case. See Van Ardsall, 475 U.S. at 684.

The government bears the burden of showing that a violation of the Confrontation Clause was harmless beyond a reasonable doubt. See United States v. Cotnam, 88 F.3d 487, 500 (7th Cir. 1996). The government argues that "Olivares' statement was essentially cumulative evidence that added little or nothing to already overwhelming evidence against the defendant in the case." Based upon our review of the record, we are confident that the prosecution presented sufficient evidence for the jury properly to have convicted Castelan in the absence of Olivares's post-arrest statements.

With respect to the first Van Ardsall factor, Olivares's value as a prosecution witness was not overwhelming. His post-arrest statements were used primarily to establish the following facts: 1) Castelan provided the kilogram of cocaine delivered on December 17; 2) Olivares and Castelan counted the money for the kilogram of cocaine in the bathroom of the El Ranchito Restaurant; 3) Nina-Hernandez was supposed to provide security on December 30, turn the garage door opener over to Castelan at the gas station, and inform Castelan when it was safe to deliver the cocaine; and 4) while he was waiting with Agent Karountzos for the six kilograms of cocaine to be delivered, Olivares called Castelan to discuss the plans for delivery.

All but one of the facts corroborated by Olivares's testimony were established by other evidence presented at trial. DEA Agent Suzanne Mitchell testified that Castelan admitted making

arrangements with Garcia-Sandoval to provide the kilogram of cocaine sold to "Frank" on December 17. Nina-Hernandez testified as to his role in the transaction on December 30. And, finally, Agent Karountzos testified that while he was waiting with Olivares for the six kilograms of cocaine to be delivered Olivares spoke on the phone to someone named "Juan" in Spanish. Furthermore, in an audiotape of the meeting between Agent Karountzos and Olivares that was played for the jury and translated into English, Olivares is heard telling Juan, "[t]his guy is ready . . . have Carlos come up with . . . the five." Although both Castelan and Garcia are named Juan, no telephone calls were placed between the cellular phones of Olivares and Garcia. Several phone calls, however, were placed between the cellular phones of Olivares and Castelan on the morning of December 30.

Although the government was unable to corroborate Olivares's testimony that he and Castelan counted the money for the cocaine in the bathroom of the El Ranchito restaurant, such corroboration was unnecessary given the strength of the government's other evidence./8 First, the Mercury Cougar Castelan was occupying at the time of his arrest was found to contain six kilograms of cocaine. Although Castelan initially disclaimed any knowledge that the cocaine was hidden in the car, he later admitted in his post-arrest interview that he told Garcia-Sandoval, the owner of the car, to provide the six kilograms of cocaine. Moreover, Castelan admitted to calling Garcia-Sandoval to obtain the initial kilogram of cocaine sold to "Frank" on December 17, so the evidence that he helped count the money received from the sale of that cocaine added little. Next, Olivares is heard on the audiotape telling Agent Karountzos that "Juan" is bringing the six kilograms of cocaine. On the same audiotape, Olivares states that the six kilograms of cocaine is being provided by the same source that provided the cocaine on December 17. Finally, telephone records evidence extensive telephone calls between Castelan and Olivares and Castelan and Garcia-Sandoval on the dates and around the precise times of the two drug transactions. For example, in a phone call placed at 5:13 PM on December 29, 1999, Olivares informed "Frank" that his suppliers had just called him about when the six kilograms of cocaine could be delivered; telephone records show that at 4:44 PM that day a call was placed from Castelan's cellar phone to Garcia-Sandoval's cellular phone, and at 4:49 PM a call was placed from Castelan's cellular phone to Olivares's cellular phone. Furthermore, even though Garcia-Sandoval's car was found to contain the six kilograms of cocaine that Olivares agree to sell

to "Frank," no telephone calls were ever placed between the cellular phones of Olivares and Garcia-Sandoval. Rather, the telephone records demonstrate a pattern of Castelan contacting Garcia-Sandoval either shortly before or shortly after speaking with Olivares./9 In light of Castelan's own admissions and the other evidence presented at trial, it is clear beyond a reasonable doubt that the decision to admit Olivares's post-arrest statements did not affect the jury's overall verdict.

III.  CONCLUSION

Because Olivares's post-arrest statements possessed insufficient particularized guarantees to satisfy the Confrontation Clause, the district court erred in allowing the statements to be presented at Castelan's trial. But, after balancing Olivares's value as a prosecution witness, the cumulative impact of his out-of-court statements, and the overall strength of the government's case, we conclude that the decision to admit his out-of-court statements was harmless beyond a reasonable doubt. Therefore, the judgment of the district court is AFFIRMED.


/1 Shortly before Olivares told "Frank" that he had spoken to the "guy" whose employee would deliver the "truck," two calls were placed from Olivares's cellular phone to Castelan's cellular phone, and one call was placed from Castelan's cellular phone to Garcia-Sandoval's cellular phone.


/2 Telephone records document the following calls that afternoon: 1) at 2:01 PM a call was made from Castelan's cellular phone to Garcia-Sandoval's cellular phone; 2) at 2:34 PM a call was made from Olivares's cellular phone to Castelan's cellular phone; 3) at 2:44 PM a call was made from Olivares's cellular phone to Castelan's cellular phone; and 4) at 3:11 PM a call was made from Castelan's cellular phone to Olivares's cellular phone.

/3 Telephone records for December 29, 1997, establish that shortly before Olivares spoke with "Frank," a call was placed from Castelan's cellular phone to Olivares's cellular phone.

/4 Telephone records establish that between 9:35 AM and 10:36 AM on the day of arrest, four calls were placed from Castelan's cellular phone to Olivares's cellular phone, three calls were made from Olivares's cellular phone to Castelan's cellular phone, two calls were made from

Castelan's cellular phone to Garcia-Sandoval's cellular phone, and three calls were made from Garcia-Sandoval's cellular phone to Castelan's cellular phone. No phone calls were placed between Olivares's cellular phone and Garcia-Sandoval's cellular phone. In addition, on a recording from a body transmitter worn by Agent Karountzos, Olivares is heard having a telephone conversation in which he tells "Juan" to "have Carlos come up with the five" after getting his okay. On the same recording, Olivares tells "Frank" that "Juan" is bringing the cocaine and that the same people will be providing the six kilograms of cocaine who provided the previous kilogram of cocaine.

/5 Garcia-Sandoval failed to appear for his arraignment and remains a fugitive.

/6  Rule 804(b)(3) provides that a statement is not excluded by the hearsay rule if the declarant is unavailable and it is:

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

/7 The only case we have decided involving Lilly concerned the admissibility of out-of-court statements the defendant made to his fiancee. See Robbins, 197 F.3d at 840. In Robbins we followed the plurality opinion in Lilly, and in upholding the admission of the statement to the defendant's fiancee, we explicitly distinguished it from a confession to law enforcement. See id at 839.

/8 In addition to Olivares's post-arrest statements, evidence presented at Castelan's trial included: 1) the testimony of Agent Karountzos, audiotapes of five conversations between Agent Karountzos and Olivares, and an audiotape of the final meeting between Agent Korountzos and Olivares, which was recorded by a hidden transmitter; 2) the testimony of two DEA agents who conducted video surveillance of the two cocaine deals as well as redacted videotapes made by the agents; 3) the testimony of DEA Agent Suzanne Mitchell who described several admissions Castelan made during his post-arrest interview; 4) phone records documenting the calls made from Castelan's, Olivares's, and Garcia-Sandoval's cellular phones and exhibits summarizing those calls; and 5) the testimony of Nina-Hernandez.

\9 Castelan's argument that Olivares directly

contacted Garcia-Sandoval to obtain cocaine for both transactions is further undermined by his own post-arrest statement that he contacted Garcia-Sandoval to obtain the cocaine for the first transaction. We note, moreover, that in a taped conversation played for the jury, Olivares stated that the cocaine for the second transaction would be provided by "the same people" who provided the cocaine for the first transaction.