In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1794

United States of America,

Plaintiff-Appellee,

v.

Pablo Ochoa, Jr.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 99 CR 66--Rudy Lozano, Judge.

Argued September 8, 2000--Decided October 12, 2000

Before Flaum, Chief Judge, and Posner and Rovner,
Circuit Judges.

Flaum, Chief Judge.  Pablo Ochoa, Jr., appeals
his conviction for conspiracy to commit mail
fraud in violation of 18 U.S.C. sec. 371. He
challenges the government's use of hearsay
testimony at his trial and argues that venue was
improper. For the reasons stated herein, we
affirm the defendant's conviction.

I.  Background

On February 23, 1995, defendant Pablo Ochoa,
Jr., who lived in Chicago Heights, Illinois,
purchased a 1995 Buick Roadmaster for $32,635.
Because he traded in two cars on which he had a
negative equity position, he paid approximately
$7000 more than the Roadmaster was actually
worth. To finance his purchase, he took out a car
loan with monthly payments of $669 for five
years.

Shortly after purchasing the Roadmaster, Ochoa
asked Dave McLaughlin, who lived in Ochoa's home
as a tenant, if he knew anyone who could make the
car "disappear." McLaughlin called Gaylen
Strange, his brother-in-law, who had previously
been in the chop shop business, and asked if he
knew of anyone who could dispose of a car.
Strange contacted Mark Hinkle. Hinkle also had
chop shop experience but was now an FBI

informant. Ochoa never had any direct contact with either Hinkle or Strange. Hinkle contacted FBI Agent Bill Haman and relayed that Strange knew an owner who wanted to give up his car. Hinkle then arranged for Strange to deliver the Roadmaster to Agent Haman, who was posing as a chop shop operator.

On April 1, 1995, Strange and McLaughlin delivered Ochoa's car to Agent Haman in Schererville, Indiana. Strange gave Agent Haman keys to the car and the car itself at 11:07 a.m. These keys were copies of the originals, which had been made at Elmer & Sons, a locksmith near Ochoa's home. Elmer & Sons sold a key with an embedded computer chip matching the Roadmaster's prior to April 3. Agent Haman received the Roadmaster undamaged, without any evidence of forced entry. Strange told Agent Haman that the owner of the Roadmaster was giving up his car. Agent Haman instructed Strange to tell the owner to wait three days before reporting the car stolen and that the owner should claim the car was stolen from a mall or business area. Agent Haman also agreed to pay Strange for the car during the following week.

Agent Haman and Strange met again on April 7 in Kentland, Indiana, where Agent Haman paid Strange $350. This amount indicates that Strange was serving as broker for the owner; had he actually stolen the car, Strange could have made $15,000 from selling the parts. Strange told Agent Haman that the owner of the car planned to file a bogus insurance claim. Strange further said that the CD player in the Roadmaster had a remote control and offered to get the remote from the owner.

On April 4, three days after the Roadmaster had been delivered to Agent Haman, Ochoa called the police and reported the car stolen from his garage. Ochoa informed the responding officer that he had last seen the car on April 3 at 10:00 p.m. Ochoa also stated that the car was locked and he still had the keys to the car in his possession.

Ochoa filed an insurance claim and gave a statement to the adjuster on April 5. Ochoa told the adjuster that the last time he had seen the car was April 1 at 2:00 p.m. Ochoa also remarked that he was unsure whether he could afford the car. Ochoa was in the midst of some credit problems at the time and was making payments on an $89,000 revolving line of credit. The adjuster did not find that the claim was either wrongful or fraudulent and recommended payment. The insurance company determined that $25,550 was the actual value of the Roadmaster and mailed the bank holding Ochoa's loan for the car a check for

that amount.

FBI Agent Theodore May later interviewed Ochoa. Ochoa stated that he had last seen the car the night of April 3 when he parked it in his garage. Ochoa further told Agent May that he bought the car for $25,000 and that his monthly payments were $425.

Ochoa and Strange were indicted for conspiracy to commit mail fraud on April 23, 1999. After his motion to dismiss the indictment for improper venue was denied, Ochoa pled not guilty. Strange originally pled not guilty, but later changed his plea and agreed to testify for the government against Ochoa.

In the process of building the case, the FBI attempted to locate McLaughlin, who had moved out of Ochoa's house. On July 8, Agent May went to the address where he believed McLaughlin lived and saw two men sitting on the porch. One man identified himself as Art Garza, the owner of the residence; unbeknownst to Agent May, the other man was McLaughlin. Garza stated that he knew McLaughlin and might see him in the next few days. Agent May told both Garza and the unidentified McLaughlin that McLaughlin could benefit by talking to the FBI and that he might not be charged.

The next day McLaughlin called Agent May, and the two agreed to meet at a restaurant. McLaughlin stated that he was approached by Ochoa, who asked if he knew anyone who could make the Roadmaster disappear. Ochoa told McLaughlin that he was having severe financial problems and difficulty in paying the loan for the Roadmaster. McLaughlin explained that he then contacted Strange and asked if Strange could dispose of the car. McLaughlin further told Agent May that Ochoa had made copies of the keys to the Roadmaster in order to retain the original keys, which would support Ochoa's claim that the car had been stolen.

As trial approached, the FBI again attempted to locate McLaughlin to serve him with a subpoena to appear. Agents returned to Garza's residence where McLaughlin was still receiving mail. Garza informed the FBI that McLaughlin had left with all his belongings and said that he was moving to Maryland. The FBI spent several days looking for McLaughlin and obtained a material witness arrest warrant for him. Agent May also contacted McLaughlin's employer and learned that he stopped coming to work when the FBI began looking for him. However, McLaughlin was owed his last paycheck. After Agent May left, McLaughlin called his employer. When McLaughlin hung up, the person

who received the call used "star 69" and discovered that McLaughlin made the phone call from Ochoa's residence. Phone records revealed seven phone calls from Ochoa's home to McLaughlin's employer over the course of December 16-17, 1999.

Ochoa's trial began on January 3, 2000. The prosecution relied on the testimony of Strange and Agent Haman, among others. The government also introduced the statements of McLaughlin through Agent May over the objection of Ochoa. The trial judge ruled that this hearsay evidence was admissible as statements against interest under Federal Rule of Evidence 804(b)(3), under the residual exception of Rule 807, and because Ochoa forfeited his objection due to his own wrongdoing, as provided in Rule 804(b)(6). Ochoa testified in his defense that McLaughlin used his knowledge of Ochoa's home to break into the residence, take the Roadmaster's keys, make copies, and then steal the Roadmaster. Ochoa also stated that he was not at home on December 16-17, 1999, and so McLaughlin must have again broken into his home to make phone calls to McLaughlin's employer. The jury found Ochoa guilty, and he was sentenced to ten months, five to be served in an institution and five of home confinement.

After sentencing, Ochoa filed a notice of appeal and then a motion for release pending appeal. The trial court believed that its decision to admit the hearsay evidence was a close question, the resolution of which on appeal in Ochoa's favor would likely result in reversal or a new trial. Thus, the court granted Ochoa's motion. This appeal followed.

II. Discussion
A. Venue

Ochoa argues that Indiana is an improper venue for his trial. He claims that all of the essential acts of the conspiracy took place in Illinois, and thus venue is proper only in Illinois. The standard of review for a claim of improper venue is whether the government proved by a preponderance of the evidence that the crimes occurred in the district charged, viewing the evidence in the light most favorable to the government. See United States v. Tingle, 183 F.3d 719, 726 (7th Cir. 1999); United States v. Brandon, 50 F.3d 464, 469 (7th Cir. 1997).

Trials must be held in the state and district in which the offense was committed. See U.S. Const. art. III, sec. 2, cl. 3; Fed.R.Crim.P. 18. For crimes that occur in more than one state or district, venue is constitutionally and statutorily proper in any district in which part

of the crime was committed. See 18 U.S.C. sec. 3237(a); Tingle, 183 F.3d at 726. Thus, the traditional rule is that a conspiracy charge may be tried in any district in which an overt act of the conspiracy occurred. See United States v. Rodriguez, 67 F.3d 1312, 1318 (7th Cir. 1995); United States v. Molt, 772 F.2d 366, 369 (7th Cir. 1985) ("As long as one overt act in furtherance of the conspiracy is committed in a district, venue is proper there.").

Ochoa argues that United States v. Cabrales, 524 U.S. 1 (1998) creates a distinction between essential and unessential acts, and that venue is proper only where the essential acts of a crime took place. Under his theory, all of the essential acts, such as the formation of the conspiracy and the mailing of the false claim, took place in Illinois and so venue is proper only there. Ochoa is incorrect. Cabrales stands for the proposition that venue is improper in a district if the only acts that occurred in that district do not provide evidence of the elements of the charged crime. Id. at 6-7. In Cabrales, the government tried the defendant for a money laundering charge in the state where the funds were generated, even though the laundering itself occurred in a different state. The indictment on this charge did not involve a conspiracy or allege that the funds had been transported from one state to another. The definition of money laundering criminalizes only the financial transactions in which the money is laundered, and not the prior conduct which generated the money. For purposes of the laundering charge described in the indictment, the location of the illegal revenue generating activities was not just unessential, but wholly irrelevant. Thus, Cabrales does not involve any notion of unessential acts but rather clarifies which acts are part of the crime charged and which acts are not. Cabrales noted that the laundering count in that case did not charge a conspiracy that would link the defendant to the acts of others done in different states, id. at 7, and distinguished a decision cited by the government on the grounds that the case involved a conspiracy charge, id. at 8. The Supreme Court recently reaffirmed the settled proposition that for conspiracy charges "venue [is] proper against [the] defendant in [any] district where [a] co-conspirator carried out overt acts even though there was no evidence that the defendant had entered that district or that the conspiracy was formed there." United States v. Rodriguez-Moreno, 526 U.S. 275, 281-82 (1999).

In our case, the government's evidence shows two overt acts tending to prove the elements of the crime with which Ochoa is charged, conspiracy

to commit mail fraud, occurred in Indiana. First, Ochoa's Roadmaster was delivered to Agent Haman in Indiana. Second, Strange returned to Indiana to collect his payment for brokering the car between its owner, Ochoa, and the supposed chop shop operator, Agent Haman. Thus, venue is proper in Indiana.

## B.  Hearsay

Ochoa argues that McLaughlin's statements could not constitutionally be admitted under any of the three Federal Rules of Evidence relied upon by the district court, 804(b)(3), 807, and 804(b)(6). Ochoa claims that using this impermissible hearsay at his trial violated his rights under the Confrontation Clause of the Sixth Amendment. The government argues that the evidence was properly introduced, and even if it was not, the error is harmless. Where the defendant's Sixth Amendment right to confront witnesses is directly implicated, our review is de novo. See United States v. Williamson, 202 F.3d 974, 978 (7th Cir. 2000).

### 1.  Rule 804(b)(3).

Examination of whether a co-conspirator's or accomplice's statements against penal interest are admissible against a defendant takes place in two parts, one statutory and the other constitutional. First, the testimony must be admissible under Rule 804(b)(3). The Federal Rules of Evidence do not exclude such statements if (1) the declarant is unavailable; (2) the statement is against the declarant's penal interest; and (3) corroborating circumstances indicate the trustworthiness of the statement. See United States v. Shukri, 207 F.3d 412, 416 (7th Cir. 2000); United States v. Robbins, 197 F.3d 829, 838 (7th Cir. 1999). In addition, where a party seeks to introduce a narrative, each portion must be examined, and only those individual statements that inculpate the declarant are admissible. See Williamson v. United States, 512 U.S. 594, 600-601 (1994); United States v. Nagib, 56 F.3d 798, 804 (7th Cir. 1995).

Second, because a co-conspirator's statements incriminating the defendant do not fall within a firmly rooted hearsay exception, the Confrontation Clause requires that such evidence contain "particularized guarantees of trustworthiness" such that cross-examination would be of marginal utility in determining the truthfulness of the statements. See Lilly v. Virginia, 527 U.S. 116, 134 & n.5, 136 (1999) (plurality opinion); Robbins, 197 F.3d at 839. Such guarantees must be shown by the

circumstances of the statements themselves and cannot be proven by other evidence produced at trial. See Lilly, 527 U.S. at 137-38; United States v. Castelan, 219 F.3d 690, 695 (7th Cir. 2000). A very strong presumption of unreliability attaches to statements of co-conspirators where the statements (1) are produced through government involvement; (2) describe past events; and (3) have not been subject to adversarial testing. See Lilly, 527 U.S. at 137; Castelan, 219 F.3d at 695.

Ochoa argues that the FBI's losing track of McLaughlin's whereabouts does not make him unavailable for purposes of introducing hearsay testimony. The government, which is the party seeking to introduce the hearsay statements, bears the burden of showing that the declarant was unavailable. See United States v. Reed, ___ F.3d ___, 2000 WL 1277945, *2 (7th Cir. 2000). The prosecution met this burden. The FBI spent several days trying to locate McLaughlin. They spoke to his employer, his landlord, and other individuals, and obtained a material witness arrest warrant as well. These activities constitute a reasonable, good faith effort to uncover McLaughlin. The fact that after this kind of search the FBI was unable to find him demonstrates that McLaughlin was unavailable for purposes of the hearsay exceptions. Id.

However, McLaughlin's statements do not have particularized guarantees of trustworthiness as required by the Constitution, and therefore his statements should not have been admitted under Rule 804(b)(3)./1 The high presumption of unreliability applies because Agent May was involved in eliciting McLaughlin's statements, McLaughlin described events of the conspiracy that occurred in the past, and the statements were not adversarially tested. The circumstances in which McLaughlin made the statements cannot overcome this presumption. When Agent May approached Garza and said that McLaughlin could benefit by talking to the FBI, McLaughlin was sitting on Garza's porch and heard this proposition. Agent May informed McLaughlin that he could either be charged or cooperate and possibly not be charged when the two met. McLaughlin was also told that he was considered a lesser target of the investigation compared to Ochoa and Strange. Agent May's presentation gave McLaughlin a strong incentive to curry favor with the FBI by falsely implicating his two co-conspirators so that he would not be charged. See Robbins, 197 F.3d at 840. Similarly, McLaughlin's story spread the blame to the other participants in the conspiracy and particularly Ochoa, whom McLaughlin claims came up with the idea of engaging in insurance fraud. Id. at 839-40. Agent

May also informed McLaughlin of all the facts as May knew them before asking McLaughlin to tell his story. This gave McLaughlin an opportunity to prevaricate by confirming possibly false parts of Agent May's story and then shaping his own statements into what May wanted to hear rather than what really happened. "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." Williamson, 512 U.S. at 599-600.

The government relies on Robbins in claiming that McLaughlin's statements bear the requisite guarantees of trustworthiness. However, the declarant in Robbins made the hearsay statements to his fiancee, rather than an FBI agent as in the instant case. 197 F.3d at 840. As the above analysis shows, statements made by a co-conspirator to a law enforcement official are far less likely to be trustworthy, and thus Robbins is distinguishable. The government also argues that McLaughlin came to Agent May and was under no compulsion to make the statements in question. While voluntariness is a factor in determining whether statements against penal interest that incriminate other participants should be admitted into evidence, id., voluntariness alone is not sufficient to overcome the very strong presumption of unreliability that attaches to McLaughlin's statements in this case.

2. Rule 807.

Rule 807 is a recodification of former Rules 803(24) and 804(b)(5), and thus the same requirements for admitting evidence under these prior residual exceptions to the hearsay rule apply to 807. These requirements are (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice. See United States v. Hall, 165 F.3d 1095, 1110 (7th Cir. 1999). In addition, almost by definition, Rule 807 is not a firmly rooted exception to the hearsay rule. See United States v. Wesela, 223 F.3d 656, 664 (7th Cir. 2000). Therefore, only hearsay testimony containing particularized guarantees of trustworthiness as shown by the circumstances in which the statements were made may constitutionally be admitted under this Rule. See Ohio v. Roberts, 448 U.S. 56, 66 (1980). But as the Rule 804(b)(3) analysis shows, McLaughlin's statements do not contain such guarantees. Thus, admitting McLaughlin's statements under Rule 807 violates the Confrontation Clause in the same way that their admission under Rule 804 (b)(3) does.

3. Rule 804(b)(6).

The doctrine that a defendant may waive his or her constitutional right to confront witnesses by misconduct has been codified in Rule 804(b)(6). See United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999). Statements that would otherwise be inadmissible hearsay may be introduced into evidence if "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed.R.Evid. 804(b)(6). The government claims that this showing of procured unavailability must be made by a preponderance of the evidence, and Ochoa does not dispute that this is the correct standard./2

Ochoa does argue that the evidence is insufficient to prove wrongdoing. We agree. The government's only evidence on this issue is the seven phone calls made from Ochoa's residence to McLaughlin's employer on December 16 and 17, 1999, at least one of which was made by McLaughlin. Ochoa claims he was not at his home on those days and that McLaughlin, his former longtime tenant who knew the layout of Ochoa's residence, broke into his house and made the calls. Even if Ochoa permitted McLaughlin to make these calls, the evidence in this case is not sufficient for Ochoa to have forfeited his constitutional rights. Rule 804(b)(6) requires the conduct at issue to be wrongful, and permitting a witness at one's upcoming trial to use a phone, without more, is not a culpable act. The government has not produced evidence that Ochoa knew McLaughlin was intending to flee, and thus has not proven that Ochoa knowingly aided McLaughlin in becoming unavailable. If Ochoa did not know that he was helping McLaughlin to procure McLaughlin's unavailability, then Ochoa's conduct could not have been wrongful as required by the Rule./3


4. Harmless error.

The admission of McLaughlin's hearsay statements was erroneous and violated Ochoa's rights under the Confrontation Clause. However, constitutional error that is harmless will not cause an otherwise valid conviction to be set aside. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); Castelan, 219 F.3d at 696. The test is whether the reviewing court can determine beyond a reasonable doubt that the error did not contribute to the verdict. See Neder v. United States, 527 U.S. 1, 15-16 (1999). In analyzing whether an error is harmless, we look to factors

such as (1) the importance of the witnesses's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) whether other evidence corroborated or contradicted the witness's material testimony; and (4) the overall strength of the prosecution's case. See Van Arsdall, 475 U.S. at 684; Castelan, 219 F.3d at 696.

The first and second factors weigh somewhat in favor of the government. McLaughlin's statements establish that Ochoa approached him with a plan to commit insurance fraud, he and Ochoa asked a local locksmith to make a duplicate of the Roadmaster's keys, and Ochoa had a financial incentive to file a fraudulent claim. Though not as direct as McLaughlin's testimony, independent evidence supports the facts of each of these statements. Ochoa was unquestionably the owner of the Roadmaster, and Strange told Agent Haman that the car's owner intended to file a bogus insurance claim. Agent Haman received a set of keys for the car that had been made at Elmer & Sons, and the locksmith's records showed that a key encoded with the same computer chip as for Ochoa's Roadmaster had been sold during the period preceding April 3, 1995. Ochoa admitted on cross-examination that the Roadmaster was worth less than the amount of the loan he took out to pay for it.

The third and fourth factors more strongly support finding harmless error. The facts just recounted corroborate McLaughlin's statements and add weight to the prosecution's case. Ochoa's motive is established because the Roadmaster was worth less than its loan. A set of duplicate keys for the Roadmaster was made during the time prior to April 3, 1995, so that Ochoa could retain the originals and the copies could be delivered to the chop shop. Ochoa retained the original set of keys to make his claim of theft more believable, while the copies permitted the Roadmaster to be delivered to the chop shop undamaged. Strange told Agent Haman that the owner of the Roadmaster intended to file a fraudulent insurance claim, and Ochoa was the car's owner. The government presented additional evidence as well. Strange was paid only $350, indicating that he was brokering the car between Ochoa and a chop shop, since he could have sold the parts of a stolen Roadmaster for a much higher amount. Strange stated that he could get the car's CD remote from the owner, strongly suggesting Ochoa's involvement, since he was the owner of the car. Agent Haman told Strange to inform the owner that he should wait three days before calling in the claim, which is what Ochoa did.

Ochoa's explanations after the car was delivered

to the FBI contain numerous prevarications, which are positive evidence of his guilt. See United States v. Jocic, 207 F.3d 889, 893 (7th Cir. 2000); United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991), aff'd on other grounds, 506 U.S. 534 (1993). The Roadmaster was in possession of the FBI on the morning of April 1, 1995. Ochoa told the police officer who responded to his car theft report that the night of April 3 was the final time he saw the Roadmaster, which is impossible. In his conversation with the insurance adjuster, Ochoa stated that he saw the car for the last time during the afternoon of April 1, which is inconsistent with his statement to the police and is also a lie. Ochoa returned to his original false story when he spoke with the FBI, again claiming that he had last seen the Roadmaster on the night of April 3. These varying accounts show that Ochoa was attempting to cover up the fact that he waited a few days after the Roadmaster's disappearance before reporting the car stolen, as requested by Agent Haman. Ochoa also told the FBI that he paid only $25,000 for the car and that his loan payments were $425 per month. In fact, he had paid over $32,000 and his payments were $669 a month. These statements indicate that Ochoa attempted to hide his motive for getting rid of the Roadmaster.

In sum, the jury was presented with credible evidence that Ochoa had his car stolen so that he could file a false insurance claim, had a financial motive to do so, and falsely attempted to cover up both his act and motive. Given such circumstances, we find beyond a reasonable doubt that the jury would have convicted Ochoa without McLaughlin's statements, and so the admission of the hearsay testimony was harmless error.

III.  Conclusion

The hearsay testimony of McLaughlin was improperly admitted because it did not possess particularized guarantees of trustworthiness and Ochoa was not proven to have engaged in wrongdoing in procuring the absence of McLaughlin. However, the government provided a substantial amount of evidence demonstrating Ochoa's guilt besides these statements. Therefore, the judgment of the district court is

Affirmed.


/1 McLaughlin's conversation with Agent May was also introduced as a whole, in possible violation of Williamson. However, Ochoa does not raise this argument and so we need not analyze whether certain portions of the narrative should have

been excluded.

/2 Most courts to consider this question have held, and Fed.R.Evid. 804 advisory committee's note states, that a preponderance of the evidence is the correct standard of proof for determining whether the defendant engaged or acquiesced in wrongdoing, though some contrary authority exists. See Emery, 186 F.3d at 926-27 (collecting cases and discussing conflict). Since Ochoa does not argue this issue, we will not address it.

/3 Ochoa also argues that even knowingly aiding a witness in becoming unavailable is not sufficient for Confrontation Clause rights to be forfeited under Rule 804(b)(6). Ochoa is correct that apparently all of the cases applying this Rule and its judicially created predecessor involve much more egregious conduct, such as murder or threats of violence, than what Ochoa may have done. See, e.g., United States v. Johnson, 219 F.3d 349, 355-56 (4th Cir. 2000) (murder); Emery, 186 F.3d at 926 (murder); United States v. Aguier, 975 F.2d 45, 47 (2d Cir. 1992) (threats). On the other hand, no case has refused to apply the Rule to such circumstances, and Fed.R.Evid. 804 advisory committee's note says that criminal conduct is not required for forfeiture. Since we find that the evidence is insufficient to prove that Ochoa knowingly helped McLaughlin disappear, we need not determine whether Rule 804(b)(6) would cause a defendant's hearsay objections to be forfeited if applied to such facts.