In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 19-2385

LUIS VILLAVICENCIO-SERNA,

*Petitioner-Appellant*,

*v.*

LEONTA JACKSON,

*Respondent-Appellee*.

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 5442 — **Rebecca R. Pallmeyer**, *Chief Judge*.

—————————

ARGUED NOVEMBER 12, 2020 — DECIDED JUNE 3, 2021

—————————

Before WOOD, HAMILTON, and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. On March 22, 2009, a jury found Luis
Villavicencio-Serna guilty of first-degree murder of Armando
Huerta Jr. Scant physical evidence linked him to the charge.
The conviction instead was largely based on testimony from
three of his friends, all of whom later recanted.

Villavicencio-Serna exhausted his state-court appeals and then sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). Throughout these proceedings, he consistently has challenged the sufficiency of the evidence to support his conviction. He emphasizes the lack of physical evidence connecting him to the murder, and he suggests that several factors—inconsistencies between the testimonies of his three friends, their subsequent recantations, and the interrogation tactics used by the police—reveal that the police pressured his friends to implicate him. Finally, he offers an alternative theory that links another group to the murder. In the face of these arguments, the Illinois Appellate Court upheld his conviction. The district court, applying the double-layered deference required by section 2254(d), concluded that the state court's decision was not unreasonable, and so it refused to issue the writ. See *Villavicencio-Serna v. Melvin*, No. 17 C 5442, 2019 WL 2548688 (N.D. Ill. June 19, 2019).

Although we sympathize with the district court's observation that "the lack of any physical evidence in this case is troubling," we too conclude that Villavicencio-Serna has not shown enough to entitle him to issuance of the writ. We therefore affirm.

**I**

Huerta was shot and killed in the parking lot of his apartment complex at 307 Dale Drive, in Addison, Illinois, in the early morning hours of Saturday, May 16, 2009. Huerta had been drinking beer with his uncle, Juan Carlos Marines Rojas, that night. Around 3:30 am, a car pulled up, an occupant fired four or five shots at Huerta, and the car sped away. Although he was "a little drunk" at the time, Rojas was able to testify to these details. Rojas also told the officers, first at the scene and

later at the police station, that despite the darkness, he saw the rear passenger side of the car and could tell that it was either a dark blue or dark green Honda.

Although they had little evidence implicating any suspects, officers quickly turned their attention to Villavicencio-Serna after his girlfriend's father reported her missing the morning of Huerta's murder. Villavicencio-Serna's 16-year-old girlfriend, Josephina Vasquez, lived with her parents in the same apartment complex at which Huerta was shot. Vasquez was not missing for long. She came home later that same day, and her father took her to the police station around 7:00 pm to resolve the missing-person report.

Officer Dennis Kotlinski became suspicious that Vasquez's temporary disappearance was related to the shooting, and so he began questioning her. Vasquez initially told him that she did not know anything about the shooting but that, to her knowledge, Villavicencio-Serna was not involved. Unconvinced, the officers continued to press her about what really happened that night.

Some eight hours later, at 3:00 am on May 17, the officers began recording Vasquez's account of the story. The recording captures her saying that she spent the night with Villavicencio-Serna on the night of the shooting. After falling asleep at 2:00 am, she woke up around 5:00 am and observed that Villavicencio-Serna was cold to the touch. He told her that he "took care of business." In order to explain what "business" this might have been, Vasquez told the police that Villavicencio-Serna did not like Huerta, because Huerta had repeatedly contacted Vasquez in the past and just the last week had called her at 5:00 am. Villavicencio-Serna told Vasquez that he

was prepared to shoot Huerta or "beat his ass." After the of-
ficers asked Vasquez to speculate about where Villavicencio-
Serna had gone during the night of May 16, she said that per-
haps he went to "go shoot" Huerta. The officers dropped
Vasquez off at home shortly thereafter.

But the officers were not finished with Vasquez. They
brought her back for additional questioning a few hours later.
This time she provided a radically different account of the
events. Once again, the officers did not begin recording her
statement immediately; the recording began four hours into
the questioning. Vasquez recounted that Villavicencio-Serna
had answered the phone when Huerta called Vasquez the
week before the shooting and told him not to "f**king call[]
my lady no more." Referring to an off-line conversation, the
officers asked Vasquez to repeat a new story in which she said
that she was in the car the night of the shooting. In this ver-
sion, Villavicencio-Serna called his friend Michael Daddio to
pick him up. Daddio drove his silver Cadillac with their
friend Donald Rogers in the passenger seat, while Vasquez sat
behind Daddio and Villavicencio-Serna sat behind Rogers.
They first drove to Vasquez's apartment complex. Officers
asked Vasquez whether she pointed out Huerta when they ar-
rived; she responded that she might have said something
"like, damn, I think that's Armando." She then stated that
they drove through the parking lot twice before Villavicencio-
Serna leaned out the back passenger-side window and shot
Huerta.

Officers left Vasquez alone for less than half an hour, dur-
ing which she was visibly distraught. She threw up in a
McDonald's bag and was hunched over her seat crying. She
also paced around the room, and slammed the walls saying

that she was "f\*\*king frustrated." About five hours later, Vasquez told a substantially similar story, except that this time she said that Villavicencio-Serna reached over her to shoot Huerta.

The police next turned their attention to Daddio, whom Vasquez had implicated as the driver. Initially, Daddio denied any involvement in or knowledge of the shooting. After about six hours of unrecorded questioning and "an emotional breakdown," the cameras came on. The officers again referred to an unrecorded conversation, asking Daddio to "just pretty much [explain] what we covered before." So prompted, Daddio recounted that he was hanging out with Rogers when he received a call from Villavicencio-Serna "sometime after midnight, like 1" asking them to give Vasquez a ride home. They drove around the parking lot twice and noticed Huerta "speaking angrily." Villavicencio-Serna shouted at Huerta, fired four or five gunshots, and urged Daddio to take off. Daddio, however, recalled that Villavicencio-Serna sat behind him, not behind Rogers.

Rogers's experience at the police station followed the same pattern. After he repeatedly told the officers that he knew nothing about the shooting, he ultimately changed his story. Rogers recalled that Daddio received a call from Villavicencio-Serna around 10:00 or 11:00 pm asking Daddio and himself to hang out. They drove around for a while, Villavicencio-Serna seated behind Rogers and Vasquez behind Daddio. Eventually, Villavicencio-Serna asked to drive over to Vasquez's apartment, where Villavicencio-Serna and Huerta began yelling at each other. In short order, Villavicencio-Serna fired his gun several times.

All three of these witnesses later recanted their testimonies at trial. They each insisted that the officers used various scare tactics to convince them to implicate Villavicencio-Serna and to ratify the officers' version of the events—a version that had been fed to them while the recording equipment was off. Vasquez swore that the officers had provided every detail of her later account. Daddio accused the officers of threatening to plaster his face around the city as a murder suspect unless he adopted the story they were pushing. And Rogers said that the officers threatened to put him in jail as an accessory to the murder unless he told them the story they concocted. Unlike the other two, however, Rogers said that he made the entire story up.

While the officers were interviewing Villavicencio-Serna's friends, they brought Rojas (Huerta's uncle) to the police station to identify the shooter's car, which they now believed to be Daddio's. The officers had acquired Daddio's vehicle—a silver Cadillac—after Daddio sold it on Craigslist the day after the shooting. Allegedly unprompted, Rojas turned to Daddio's car as soon as he saw it in the parking lot and said that he immediately recognized the rear passenger-side door from the scene of the murder. To explain his earlier mischaracterization of the car, Rojas explained that it was dark on the night of the shooting, and so he mistakenly described the car as dark blue or green. He was now convinced that the silver Cadillac was the one.

Some other evidence did not fit well with the state's theory. A dark green car roughly matching Rojas's initial description drove through the parking lot within a very short time of the murder. This car played a role in Villavicencio-Serna's alternative theory of the case. Villavicencio-Serna pointed out

that a man named Paul Alvarado drove a dark green Pontiac Bonneville. On the night of the shooting, Alvarado drove with his friends Daniel Garcia and David Vargas to drop off their friend Maritza Padilla, who lived with her parents in the Dale Drive apartment complex. Huerta's aunt, Maria Marines, also lived there. Marines testified that she heard Padilla shout out for Huerta, and she then heard gunshots and the sound of tires peeling out of the parking lot. The police, however, did not pursue this possibility for long. They interviewed each of these people soon after the shooting and believed their denial of involvement. Padilla's father also recalled that she was home before he heard any gunshots.

This, then, was the key evidence presented at trial. The jury resolved the conflicts against Villavicencio-Serna, finding him guilty of first-degree murder. As we noted, after exhausting his state-court remedies, Villavicencio-Serna unsuccessfully petitioned for a writ of habeas corpus in the Northern District of Illinois. The district court declined to issue the writ, but it granted him a certificate of appealability because it concluded that reasonable jurists could debate "whether the state appellate court correctly concluded that the evidence against Petitioner was sufficient to support his conviction." See *Villavicencio-Serna v. Melvin*, 2019 WL 2548688, at *16.

## II

The Supreme Court repeatedly has emphasized that "the availability of federal habeas relief is limited with respect to claims previously adjudicated on the merits in state-court proceedings." *Harrington v. Richter*, 562 U.S. 86, 92 (2011) (quotation marks omitted). See also, *e.g.*, *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021); *White v. Woodall*, 572 U.S. 415, 419–20 (2014); *Burt v. Titlow*, 571 U.S. 12, 15 (2013). It is particularly

difficult for a petitioner to succeed when his only point is that the evidence was insufficient to support his conviction, and the state courts have evaluated that evidence and found it adequate. The Antiterrorism and Effective Death Penalty Act (AEDPA), as reflected in 28 U.S.C. § 2254(d), dictates that we review the state appellate court's determination "for reasonableness alone." *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016). This is a stricter test than the one that applies to a direct appeal, where we ask whether the evidence, taken in the light most favorable to the government and deferring to the jury's credibility determinations, can support a finding of guilt beyond a reasonable doubt. See *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010).

When confronting a section 2254 petition, we may grant relief only if the state court's evaluation of the sufficiency of the evidence was objectively unreasonable. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). The Supreme Court has described this as involving "two layers of judicial deference." *Id*. Just as in a direct appeal raising sufficiency questions, in a section 2254(d) proceeding we do not have a license to redetermine credibility of witnesses; that is the role of the trial jury. *Stern*, 812 F.3d at 611 (7th Cir. 2016).

Villavicencio-Serna takes issue with the state appellate court's determination that the evidence presented at trial was sufficient to enable a reasonable jury to find him guilty. Illinois's first-degree murder statute requires proof that the defendant killed the victim without justification while intending to kill the person, intending to do the victim great bodily harm, or knowing that the defendant's actions create the strong probability of such harm. 720 ILCS 5/9-1(a)(1) & (2)

(2008). The state was thus required to prove beyond a reasonable doubt both a prohibited act and the necessary state of mind.

The central focus of Villavicencio-Serna's petition is his contention that no reasonable jury could have relied on the testimonies of his three friends to the effect that he was the gunman. He points to *United States v. Castelan*, 219 F.3d 690 (7th Cir. 2000), in which (for purposes of the Confrontation Clause) we held that post-arrest statements made in custodial interviews, where the suspect asked about the possibility of leniency, "lack[ed] inherent particularized guarantees of trustworthiness." *Id.* at 695–96. So, too, he reasons, the witness statements here were not trustworthy. He adds that we have recently "condemned tactics designed to exhaust suspects physically and mentally," including "long interrogation sessions or prolonged detention paired with repeated but relatively short questioning." *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) (en banc). We added in *Dassey* that our concerns about the reliability of information elicited through heavy-handed interrogation tactics are heightened as applied to juveniles. *Id.* at 305.

A few aspects of the interrogations implicate these concerns. Vasquez was only 16 years old at the time of the interrogations. Her first interrogation ran roughly eight hours, until 3:00 am, before she made any incriminating statements. And only eight hours later, officers brought her back to the police station for another grueling thirteen hours of interrogation, during which she gave a completely new account that was central to connecting Villavicencio-Serna to the murder and led the officers to Daddio and Rogers. Vasquez also exhibited signs of distress. But the distress could be interpreted

two ways: either frustration from the pressure of an unwar-
ranted murder accusation, or stress from being peripherally
involved in a murder. The choice between these two possibil-
ities was for the jury. The same is true for the emotional break-
down Daddio suffered eight hours into his interrogation.

These aspects of the interrogations are concerning. So, too,
is it troubling that the three witnesses later retracted their ac-
counts, though this record does not reveal whether those re-
cantations were coordinated among them or wholly inde-
pendent. Nonetheless, section 2254(d)'s double-layered defer-
ence does not authorize us to revisit the jury's interpretation
of the course of events, or to decide whose testimony was
credible at what times. The witnesses all testified at trial. The
jury was in the best position to decide whether to trust the
recantation at trial or the initial interrogation.

Villavicencio-Serna's concerns about the tactics the offic-
ers used during the interrogation are also overstated. He con-
tends that his situation is even worse that the one that existed
in *Dassey*, but the two situations are different (and in any
event, Dassey did not prevail). 877 F.3d at 304. Villavicencio-
Serna is trying to get some mileage out of flaws in the collec-
tion of testimony that other witnesses presented against him
at trial, but the jury was aware of those problems and none-
theless resolved the case against him.

Another criticism Villavicencio-Serna raises is the use of
leading questions by the officers during the interrogations.
This, he contends, conclusively demonstrates that later state-
ments were unreliable. We can assume for present purposes
that the questions were indeed leading. For example, officers
asked Vasquez questions such as "Luis was upset though

with something right?"; "what happened with him and Armando before?"; and whether she thought that Villavicencio-Serna had a gun on him "to kill someone" at the apartment complex. Similarly, officers asked Daddio to discuss "pretty much what we covered" when their conversations were not recorded and asked him whether he received a phone call the night of the shooting. But in the end, this simply raised a credibility question for the jury.

Villavicencio-Serna next seeks to use obvious inconsistencies within each witness's testimonies and across witnesses to undermine the jury's verdict. He points to six major issues: (1) when and why they headed to Vasquez's apartment, (2) where they sat in the car, (3) what direction they were going, (4) what events preceded the shooting, (5) where Luis shot from, and (6) what happened after the shooting.

Daddio said that Villavicencio-Serna called him at 1:00 am to drive to Vasquez's apartment, but this was a full two and a half hours before the shooting. Rogers suggested that the call came closer to 10:00 or 11:00 pm. Daddio's call log reflects no calls between 9:43 pm and the time of the shooting. In addition, Daddio said that the group headed to the apartment to drop off Vasquez, but Vasquez speculated that they were going to harm Huerta. Rogers offered that they "just wanted to chill and hang out," and so they drove around for a bit before heading to Vasquez's apartment after he overheard Villavicencio-Serna having an aggressive exchange with someone on the phone. Yet Huerta's call log that night revealed no calls to Villavicencio-Serna or Vasquez. None of these differences, however, is beyond the scope of recollection. We do not

know, for instance, whose phone Daddio or Huerta was using, and people do not always recall the precise time at which things happen.

The detail about where in the car people were sitting is also one that the jury could have seen as immaterial. Rogers and Vasquez placed Villavicencio-Serna in the back passenger side of the car, while Daddio placed him on the driver's side. The same is true about the direction from which the car entered the parking lot. Vasquez contradicted herself on the question of when Villavicencio-Serna loaded his gun—as they entered the parking lot, or after they had been there for a bit. They all disagreed over whether Villavicencio-Serna spoke with Huerta before he shot him. There is more, but we need not belabor the point. There is nothing unusual about a jury hearing conflicting accounts and then resolving the facts as best it can. Nothing more sinister than that happened here.

The contradictions that appear in the record, we conclude, are not serious enough to compel a finding that the state court unreasonably concluded that the jury's verdict did not fail for lack of sufficiency of the evidence. Nor are the remainder of Villavicenco-Serna's arguments, which we address briefly.

Villavicencio-Serna urges that Maria Marines's testimony about the other car in the parking lot varies so significantly from the state's theory of guilt that no reasonable juror could find him guilty beyond a reasonable doubt. Recall that Marines, Huerta's aunt, testified at trial that she heard another resident of the apartment complex—Maritza Padilla—call out for Huerta right before hearing gunshots. Someone driving a dark green Pontiac dropped off Padilla; that car more closely matched Rojas's initial description of the shooter's vehicle.

But it was up to the jury to decide such details as Rojas's ability to observe the color in the dark of night. And Marines's testimony was not air-tight either. Once again, the state court was entitled to decide that this was only a jury question.

Villavicencio-Serna finally theorizes that even if there was enough to support a finding that he was the actual shooter, the evidence of intent to kill was so flimsy that his conviction must be set aside. This is a nonstarter. The witnesses testified that he shot at Huerta, and as we discuss below, the state court identified evidence sufficient to establish motive.

The Illinois Appellate Court methodically analyzed the record before concluding that the evidence sufficed to allow a reasonable jury to find Villavicencio-Serna guilty of first-degree murder. It concluded that the jury had ample opportunity to determine which stories were reliable. The state court further noted that the jury may have regarded some of the recantations as unreliable. For example, Rogers testified that he could not have been in the car that night because he was with his girlfriend, but Rogers's girlfriend testified that Rogers was *not* with her at the time of the murder. The court added that the jury was entitled to credit Rojas's identification of Daddio's car at the police station, and that it could find motive from Villavicencio-Serna's "invective-laden message on Huerta's phone" the week before the murder.

Finally, the state court confronted Villavicencio-Serna's alternative theory of the case, namely that someone in a green Pontiac was the shooter. The court noted that a jury believing Marines's testimony that the gunshots occurred when Maritza arrived at the apartment would necessarily have to reject Rojas's identification of Daddio's car at the station and Maritza's father's testimony that she was home before he heard

any gunshots. Ultimately, the state court concluded that some witnesses had to be wrong, and it was the role of the jury to decide which ones to reject.

None of these conclusions falls so far outside the boundaries of rational disagreement that we could brand it unreasonable. Not every case has the kind of physical evidence that definitively resolves doubts, but neither is that type of evidence required. Here, the state court concluded that the testimonial evidence and the circumstantial evidence met constitutional standards. Villavicencio-Serna has not given us any reason powerful enough to disturb that conclusion.

### III

Our review of a petition for a writ of habeas corpus based solely on the sufficiency of the evidence to support a conviction is circumscribed by the double-layered deference of section 2254(d). Applying that standard, we conclude that the district court correctly denied Villavicencio-Serna's petition, and we AFFIRM its judgment.