In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3659

GREGORY AGNEW,

Petitioner-Appellant,

v.

BLAIR J. LEIBACH,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 3700--Blanche M. Manning, Judge.

ARGUED JANUARY 18, 2001--DECIDED MAY 21, 2001

   Before CUDAHY, KANNE and ROVNER, Circuit
Judges.

   ROVNER, Circuit Judge.  Gregory Agnew
sought habeas corpus relief from his
conviction for armed robbery in Illinois
state court twelve years ago. In addition
to a claim for ineffective assistance of
counsel, Agnew maintained that the
Illinois trial court should have granted
him a mistrial when the State called as a
substantive witness of his guilt the
bailiff who had been in charge of the
jury throughout the first part of his
trial. The district court found that
Agnew could not show that he was
prejudiced by the bailiff's testimony,
and that his attorney's decisions were
reasonable under the circumstances, and
thus the court denied habeas relief.
Because the prejudice of the bailiff's
testimony is inherent under relevant
Supreme Court precedent, we reverse and
remand.

I.

   Agnew was charged with armed robbery for
allegedly hitting a man over the head
with a garden hoe, and taking a dollar
from him in an altercation at a gas
station. Agnew intended to admit at trial
that he was involved in an altercation
with the victim, Carlos Duarte, but
planned to testify that the fight

concerned who had the right to use a pre-paid gas pump, and that Duarte delivered the first blow. Agnew denied that he took any money from Duarte or that he intended to take any money from him. The State's challenge was to show that Agnew was motivated by robbery and that he, not Duarte, was the attacker. In order to prove all of the elements of robbery (as opposed to battery), the State also was required to show that Agnew in fact took money from Duarte.

The trial began on June 13, 1988./1 After hearing motions in limine, the trial court asked the bailiff, Deputy Fred House, to direct the prospective jurors into their seats in the courtroom. The court began conducting voir dire, but before all the jurors were selected, the court called a recess at noon for lunch. At 1:30 p.m., the court reconvened and completed jury selection. After another brief recess, the trial commenced at approximately 1:45 p.m. The State presented three witnesses that afternoon in support of the charge. Throughout this portion of the trial, Deputy House performed all the duties of a bailiff, including ushering the jury in and out of the courtroom.

The first witness, Sandra Hill, testified that she, Tommy Miller, Derrick Lovelace, Bay Walls and Agnew were all at the home of Haakeem Adu on the night in question. Everyone present was drinking beer and wine, and although the record does not reveal whether they were intoxicated, that would be a reasonable inference to draw from their behavior that night. In the wee hours of the morning, Agnew began arguing with Miller, and they went outside to fight. After the fight, Miller noticed he was missing $200 in cash and some heroin. Hill, Miller, Walls and Agnew searched unsuccessfully for the missing items, and Walls then left the party. Shortly thereafter, the remaining revelers began to suspect that Walls was the thief and Hill, Miller, Lovelace and Agnew went out in Lovelace's car to look for him. For reasons not revealed in the record, Miller placed a garden hoe in the back seat of the car next to Agnew. After driving around for some time, and unable to find Walls, they stopped at a gas station for snacks at approximately 3:30 a.m. Hill testified that at the gas station, Agnew said he

saw a Mexican man coming out of the station with a large amount of cash in his hands, and asked the others in the car if anyone wanted to "be in on it." Because the other passengers wanted no part of this kind of trouble, they declined, and when Agnew got out of the car, they drove away from the station. As they drove away, Hill heard a man yell, and she turned and saw Agnew hitting a man with the garden hoe.

That man, Carlos Duarte, was the State's next witness. He testified that he stopped for gas on his way to work, and that he went into the station to pre-pay for five dollars worth of gas with a fifty dollar bill. He placed his change in his shirt pocket as he went outside to pump the gas, but he was hit on the head from behind and fell to the ground. He testified that Agnew grabbed him by the collar and demanded money. Agnew searched Duarte's coat pocket, pants pockets and wallet and took a dollar that he found in a pants pocket. He did not find the $45 in Duarte's shirt pocket. Duarte required eight stitches for his injuries.

The last witness in the State's case-in-chief was Officer Herbert Browne. He testified that Agnew called the police that night to report that Lovelace had threatened him with a garden hoe and then had stolen his jacket. Browne met with Agnew at 4:30 a.m., and after Agnew lodged his complaint, he asked the officer if anyone had reported a robbery in the vicinity of the gas station that night. The officer did not record this inquiry in his official report, presumably because he did not consider it significant at the time. Officer Browne's in-court testimony concluded at 3:45 p.m. on the first day of Agnew's trial, and the court decided to recess for the day. The jury was sent home for the evening.

The assistant state's attorney then informed the court that the bailiff who had been attending the jury, Deputy Fred House, had come forward to report that on the day Agnew was arrested some four months earlier, the deputy had a material conversation with Agnew. Deputy House had apparently been stationed at the local jail at the time of Agnew's arrest. The state's attorney informed the trial court that Agnew told Deputy House that he had taken a dollar on the night in question.

The State wished to reserve the right to call Deputy House as a rebuttal witness if Agnew decided to testify in his own defense. Acknowledging that a special relationship is engendered by the bailiff caring for the jury, the State requested that the court appoint a different bailiff to attend to the jury for the re mainder of the trial. Agnew's counsel immediately moved for a mistrial. The State opposed the motion, arguing that a mistrial was premature because the State was not certain it would call the Deputy to testify. The State also contended that there was no evidence that the jury was improperly influenced, and that no irreparable harm had been done in the mere two hours of testimony that had been taken at that time. Agnew's counsel maintained that whether or not the Deputy had discussed the case with the jury was irrelevant, and that the prejudice was inherent when the person charged with caring for the jury becomes a witness against the accused.

The court agreed that a different bailiff should be appointed to take charge of the jury for the remainder of the trial. Agnew's counsel declined the court's invitation to question the deputy about any conversations he had with the jurors, and the court commented that the deputy's contact with the jury at that point was "extremely brief." Tr. at 224. Finding that there was no "long term involvement" with the jury as would occur during sequestration, the court denied the motion for a mistrial. Tr. at 225. No one inquired whether the deputy had accompanied the jurors to lunch, or to what extent he had conversed with them about any matter, including the trial. On the next day, the State rested, and Agnew took the stand in his own defense. He told a decidedly different story. He testified that he was a passenger in a car with Lovelace, Miller and Hill on the night in question. He claimed he was simply seeking a ride home, but others in the car decided to drive around town looking for places to buy drugs. According to Agnew, the group stopped for gas, and Lovelace asked him to pump the gas and get rid of the hoe. As Lovelace went in to pay, Agnew tossed the hoe towards a garbage can but missed. Agnew testified that Duarte then walked up and attempted to use the pump. They began to argue over who had the right to use the

pump, and after Duarte kicked Agnew in the groin, Agnew picked up the hoe and fought back. Agnew denied taking any money from Duarte. As he fought with Duarte, Agnew saw Lovelace get back in the car and drive away with Agnew's coat, which was still in the car. Agnew then reported the theft of his coat to the police, but did not mention the fight because he feared expulsion from an alcohol rehabilitation program he had voluntarily joined.

The defense rested and the State called Deputy House in rebuttal. He testified that he had been working at the Lake County Jail on the day Agnew was arrested. He stated he met Agnew during the shift change, and asked Agnew, "What the fuck are you doing here?" Deputy House testified that Agnew replied, "It's over a dollar. Fucked up. This is over one dollar. Someone should beat my ass and let me go home." Deputy House conceded that he did not write a report of the conversation, and that he did not realize the incident was important until he sat through the first day of trial. At that time, he informed his supervisor and the state's attorney about the conversation.

During closing arguments, the state's attorney drove home the significance of this jail house conversation, characterizing it as an admission and mentioning it no fewer than six times. Tr. at 282 ("[T]here's no doubt that Gregory Agnew did it because he admitted to doing it."); Tr. at 285-86 ("Fred House just took the stand and told you that he told him that down there in that bullpen on the 24th in the afternoon, he asked him what the heck are you in here for, what are you back for? I robbed him. It was over a buck. It was over a fucking dollar. You ought to whip my fucking ass and send me home for a dollar. That's what he told him."); Tr. at 287 ("And you know he did it because he admitted to it to Fred House."); Tr. at 288 ("You had the defendant's own statement [that he took money from Duarte]."); Tr. at 302 ("Who is the next person we hear that is talking about a robbery? That's Deputy House. . . . And again it's a situation where a very general comment was made by Deputy House, what are you doing here? And what are the defendant's words? I fucked up. . . . At that point he knew he

had done something wrong and he says this is over a dollar, but he says more than that, he says all I got was a dollar. You should take me outside and whip me for a dollar."); Tr. at 307 ("[A]nd then finally you've got Fred House who says the defendant made the comment that all he got was a dollar."). After deliberating for 31 minutes, the jury returned a verdict of guilty of the offense of armed robbery. The trial court sentenced Agnew to 30 years of imprisonment.

Agnew appealed, complaining that the court should have granted a mistrial when the bailiff who attended to the jury was allowed to testify as the sole witness to his alleged confession. Agnew further objected to the fact that this witness was not revealed until the middle of the trial. Agnew relied mainly on Turner v. Louisiana, 379 U.S. 466 (1965), a case we will consider in depth shortly. The Illinois Appellate Court deferred to the trial court's statement that the contact between Deputy House and the jury was quite limited, and thus the Deputy's dual role in the courtroom was not prejudicial to Agnew. People v. Agnew, 548 N.E.2d 1139, 1143 (Ill. App. 2 Dist. 1989). The appellate court noted that although there was some contact between the bailiff and the jurors, it was nowhere near the "continuous and intimate association" present in the Turner case. Id. The court remarked that the record does not indicate what Deputy House's duties were before and after the jury was impaneled, and that testimony lasted a mere two hours on the first day of trial. Moreover, the court commented that "[t]here is no indication that he provided them lunch, provided personal services or had conversations with any of the jurors. The trial judge was closer to the events of the day and a direct observer of the activities in the courtroom." Id./2 The court also rejected any argument about prejudice arising from the late identification of Deputy House as a witness because the Deputy's assignment to the courtroom was accidental, and the court took steps to minimize the prejudice to Agnew once the situation came to light. The appellate court therefore affirmed the trial court's order denying the motion for a mistrial. Finally, the court rejected Agnew's challenges to his sentence, and

because he does not raise those issues in his request for habeas corpus review, we will not discuss those issues further. The Illinois Supreme Court subsequently twice denied Agnew's petitions for leave to appeal to that court. See People v. Agnew, 553 N.E.2d 397 (Ill. 1990); People v. Agnew, 647 N.E.2d 1011 (Ill. 1995). Agnew therefore exhausted all of his state court remedies before applying for habeas corpus relief in the federal court.

In the district court, Agnew filed a sec. 2254 petition raising six main issues. See United States ex rel. Agnew v. Detella, 1998 WL 483502, *4 (N.D. Ill. Aug. 11, 1998). According to the district court, he procedurally defaulted two of these by failing to raise them in the state courts when he had the opportunity. Four claims remained: (1) the trial court erred when it denied his motion for a mistrial based on Deputy House's testimony; (2) the prosecutor's closing argument was so unfairly prejudicial as to deprive him of a fair trial; (3) his trial counsel was ineffective for failing to accept the trial court's invitation to question the jurors to determine whether they had been improperly influenced by anything Deputy House said or did while they were in his charge; and (4) his trial counsel was ineffective for failing to call or interview Lovelace and Miller, who apparently would have recanted their statements to the police that Agnew had invited them to participate in the robbery of Duarte. Id. The district court rejected the first claim, finding that the situation with Deputy House did not deny Agnew a fair trial, and that the probative value of the Deputy's testimony outweighed any prejudice. Deferring to the trial court's finding that the contact between the Deputy and the jury was quite limited, the district court cited the Illinois Appellate Court for the proposition that the Deputy did "not appear to have conversed with the jurors or provided them with lunch or personal services." 1998 WL 483502 at *7. The district court found that because of the limited nature of the contact, Agnew's case was distinguishable from Turner and Gonzales v. Beto, 405 U.S. 1052 (1972), the two Supreme Court cases on which Agnew relied. The court also found that Deputy House was simply one of a number of witnesses who testified against Agnew,

and that his testimony was by no means a "smoking gun" that alone indicated his guilt. Thus, even if the admission of the Deputy's testimony was error, the district court found that it was harmless, and did not result in the denial of fundamental fairness. 1998 WL 483502 at *7-*8. The district court similarly rejected Agnew's three other claims, and therefore denied his petition for a writ of habeas corpus. Agnew appeals.

II.

Agnew filed his petition for a writ of habeas corpus prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Because the amendments to the habeas corpus statute contained in that Act do not apply, we will analyze Agnew's claim under the prior law. See Lindh v. Murphy, 521 U.S. 320 (1997); Abrams v. Barnett, 121 F.3d 1036, 1037 (7th Cir. 1997). Prior to the AEDPA, federal courts disregarded the state court's legal conclusions and reached independent judg ments on the issues presented to them, but deferred to the state court's findings of fact. Koo v. McBride, 124 F.3d 869, 872 (7th Cir. 1997). Under the pre-AEDPA standards, the petitioner is entitled to plenary review of his claims. This Court may rely on its own jurisprudence as well as the Supreme Court's case law in determining whether the state court's conviction of the petitioner is contrary to clearly established federal law. Abrams, 121 F.3d at 1037. Under the post-AEDPA scheme, we may look only to the Supreme Court's holdings for that inquiry.

In his appeal, Agnew contends that the state trial court should have granted his motion for a mistrial because the trial bailiff was allowed to provide substantive testimony regarding his guilt, contrary to Gonzales v. Beto, 405 U.S. 1052 (1972) and Turner v. Louisiana, 379 U.S. 466 (1965). He maintains that all of the courts to review this question erred when they required him to prove he was prejudiced by the bailiff's relationship with the jury rather than assume inherent prejudice. He faults the trial court for failing to develop a fact record regarding the bailiff's contacts with the jury, and complains that his attorney's failure to develop such a

record post-conviction constituted ineffective assistance of counsel. Finally, Agnew argues that admission of the bailiff's testimony was reversible error. He seeks a reversal of the district court's refusal to grant the writ of habeas corpus.

A.

More than one hundred years ago, the Supreme Court recognized and warned against the prejudicial effect of communications between jurors and third parties such as witnesses or court officers. See Mattox v. United States, 146 U.S. 140 (1892). In that case, Clyde Mattox faced murder charges in a Kansas court. The evidence was entirely circumstantial, but as the jury deliberated, the bailiff, referring to the defendant, told them, "This is the third fellow he has killed." 146 U.S. at 142. Not surprisingly, the jury returned a verdict of guilty, and Mattox was sentenced to death./3

The Supreme Court granted Mattox a new trial. After noting the importance in capital cases "that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment," the Court held:

Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.

146 U.S. at 150. The Court noted a number of cases litigated in the state courts in which the presence of a bailiff in the jury room during deliberations was held fatal to the verdict even without a showing of prejudice or improper influence on the jury. In analyzing the effect of the communication with the bailiff in Mattox's case, the Court stated, "Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion." 146 U.S. at 151. The Court thus recognized that the bailiff, an officer of the court,

held special sway with the jury. The Court found this fact alone sufficient to overturn the verdict, but also ordered a new trial on other grounds as well.

Of course, the bailiff in the instant case did not communicate with the jury about Agnew's guilt during deliberations, but rather testified under oath at trial. The record here reflects no misconduct on the part of Deputy House. On the contrary, as soon as he realized the import of his prior conversation with Agnew, he spoke to his supervisor and informed the state's attorney about the alleged confession. But even in the absence of misconduct on the part of the testifying deputy, the Supreme Court has noted the prejudice inherent when a bailiff attending the jury also testifies against the defendant on a substantive matter relating to his guilt. See Turner v. Louisiana, 379 U.S. 466 (1965); Gonzalez v. Beto, 405 U.S. 1052 (1972). The Court set the standards for the analysis in Turner.

Turner was charged with murder committed during the course of a robbery. After a three-day trial, he was convicted and sentenced to death. The two principal witnesses for the prosecution were the deputies who investigated the murder, arrested and questioned Turner, and took his written confession. The jury was sequestered throughout the trial, and was placed in the charge of the sheriff's office. As a practical matter, this meant that the jury was continuously in contact with the sheriff's deputies, including the two deputies who provided the most damning testimony against Turner. These deputies drove the jurors to a restaurant for their meals, transported them to their lodgings each evening, ate with them, conversed with them and ran errands for them. 379 U.S. at 467. There was no evidence regarding what the deputies said to the jurors, except that the deputies themselves testified that they had not discussed the case with any of the jurors. Nevertheless, the Supreme Court held that Turner was entitled to a new trial. 379 U.S. at 474.

Noting that the right to a jury trial included the right to trial by a panel of impartial, indifferent jurors, the Court commented that, in a constitutional sense, trial by jury implies that all of the evidence against the accused will

come from the witness stand in a public courtroom where there is full judicial protection of the defendant's rights of confrontation, cross-examination, and counsel. 379 U.S. at 472-73. That evidence necessarily includes the credibility of the witnesses against the defendant. In Turner's case, the deputies' testimony "was not confined to some uncontroverted or merely formal aspect of the case," and Turner's guilt turned on their credibility. Although their credibility was challenged in the courtroom, the "potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality." 379 U.S. at 472-73. The Court explained that, even assuming the deputies did not discuss the case with jurors,

it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial--an association which gave these witnesses an opportunity . . . to renew old friendships, and make new acquaintances among the members of the jury.

379 U.S. at 473./4 Indeed, the Court found it sufficient reason to overturn the verdict that any two key prosecution witnesses had engaged in this kind of contact with the jury, but the fact that they were deputy sheriffs made the association even more prejudicial. 379 U.S. at 474. "[T]he relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial." Id. See also Parker v. Gladden, 385 U.S. 363, 365 (1966) ("the official character of the bailiff-- as an officer of the court as well as the State--beyond question carries great weight with a jury which he had been shepherding."). The Court noted that Turner's fate depended upon how much confidence the jury placed in these two witnesses, and reversed the judgment.

   Turner was followed seven years later by a case that even more closely resembles

the circumstances of Agnew's trial. In Gonzales v. Beto, Gonzales was charged with murder, and the primary witness against him was the county sheriff who wrote up the confession of the illiterate defendant. Only one other witness connected Gonzales to the crime, a person who corroborated part of the sheriff's testimony. 405 U.S. at 1052. As in Turner, the sheriff played a dual role at trial. Not only was he the key witness for the prosecution, but he was also the bailiff in charge of the jury. During the one-day trial, the sheriff conducted the jury in and out of the courtroom, once even stepping down from the witness stand where he was undergoing cross-examination in order to retire the jury at the court's request. 405 U.S. at 1052-53. He walked with the jurors to a restaurant for lunch, conversing with them along the way. He also ate with them in a private dining room at the restaurant. As the jurors deliberated late in the afternoon, they asked the sheriff/bailiff to bring them soft drinks, which he did. 405 U.S. at 1053. The jury returned a verdict of guilty, and Gonzales eventually sought habeas relief in federal court based on Turner. Both the district court and the court of appeals found Turner distinguishable on the grounds that the bailiff's association with the jurors was less extensive and less intense than the association among the deputies and the jurors in Turner, where the jurors were sequestered for three days. 405 U.S. at 1054.

The Supreme Court took a different view, reversing the judgment of the district court and the court of appeals in a summary fashion, citing Turner. Three justices filed a concurring opinion, characterizing this contact between the sheriff and the jury as "substantial and continuing" over the course of the one-day trial./5 405 U.S. at 1053. Acknowledging that Turner did not set down a rigid per se rule requiring reversal of a conviction whenever a jury came into contact with a witness, the plurality noted a number of circumstances where such an encounter would not present a constitutional problem. For example, association between a jury and a witness whose testimony was confined to some uncontroverted or merely formal aspect of the case would not pose a problem. 405 U.S. at 1054. Similarly, most brief

encounters that occurred by chance would not require reversal, and indeed accidental meetings in the hallway or on a courthouse elevator were described by the Court as "often inevitable." 405 U.S. at 1054-55.

The distinction drawn by the plurality was that, in Turner, the Court was faced with crucial witnesses against the defendant, who associated with the jury as their official guardians throughout the trial: "At the heart of our holding in Turner lay a recognition of the great prejudice inherent in the dual role of jury bailiff and key prosecution witness." 405 U.S. at 1055. The plurality explained that the adversary system demands that the roles of the prosecution, the defense and the court be kept separate and distinct in a criminal trial:

When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted.

405 U.S. at 1055-56. Noting that the extent and intensity of the association between the bailiff and the jury will vary from case to case, the plurality found that in this case, it could not be characterized as de minimis, even though the trial lasted only one day and the jury was not sequestered. 405 U.S. at 1056. Given the inherent prejudice recognized in Turner, the plurality declared, "It is enough to bring the petitioner's case within the four corners of Turner that the key witness for the prosecution also served as the guardian of the jury, associating extensively with the jurors during the trial." 405 U.S. at 1056.

B.

With that framework in place, we now turn to the facts of Agnew's trial. Deputy House served as the bailiff for the first day of Agnew's two-day trial. The trial court replaced him as bailiff when it became apparent that the deputy would also serve as a witness for the prosecution. The record does not reveal

whether the deputy accompanied any jurors to lunch on the first day of the trial, and the trial court characterized the contacts between Deputy House and the jurors as "extremely brief," with no "long term involvement." Of course, a trial judge would not be in a position to view contacts between the bailiff and the jury that occurred outside the courtroom, and no one inquired about those contacts. Thus, the record contains no information about the deputy's out-of-court contact with the jurors. Everyone agrees that Deputy House, in his capacity as bailiff, accompanied the jury in and out of the courtroom on numerous occasions and generally performed the functions of a bailiff. Turner and Gonzales both emphasize the special nature of the relationship between the bailiff and the jurors under his charge. This was not a chance encounter on an elevator but was a continuous association throughout the first day of a two-day trial. Under Gonzales, this association is enough to infect the proceedings with extreme prejudice even in the course of a one-day trial, and it is impossible to draw a principled distinction between the trials of Agnew and Gonzales. See Smith v. Collins, 977 F.2d 951, 957 (5th Cir. 1992), cert. denied, 510 U.S. 829 (1993) ("if a person serves as both a bailiff and a witness in the same trial, the conviction is invalid."). Nor is it relevant that we do not know if the bailiff ever discussed the case with the jurors. See Turner, 379 U.S. at 473 (even assuming the bailiff never discussed the case with the jurors, extreme prejudice is inherent when the jury is in a continual association with key witnesses who acted as official guardians for the jury). During the time the jury associated with Deputy House, they had the opportunity to develop confidence in his word in ways that were not subject to cross-examination or the right of confrontation. Because Deputy House's credibility was key to Agnew's conviction, the "potentialities of what went on outside the courtroom" during that first day of trial may have rendered any in-court proceedings "little more than a hollow formality." Turner, 379 U.S. at 473. Under Turner and Gonzales, that opportunity for the bailiff to gain credibility with the jury outside the courtroom is fatal to the verdict if the bailiff's testimony relates in a

substantive way to the defendant's guilt.

The importance of Deputy House's testimony is the source of some dispute. The State was quite anxious to use the testimony at trial, but the government now seeks to minimize its importance. The government claims that Agnew would have been convicted anyway because of the testimony of Carlos Duarte, Sandra Hill and Officer Herbert Browne. Agnew, of course, admitted that he hit Duarte with the garden hoe. The issues at trial were whether he struck the first blow and whether he also robbed Mr. Duarte. Officer Browne testified that Agnew asked him whether anyone had reported a robbery near the gas station that night. Sandra Hill testified that Agnew commented on how much money Duarte was carrying and asked if anyone wanted "in on it" as he exited the car. She also testified that she saw Agnew hit Duarte with the garden hoe. Finally, Duarte himself testified that Agnew hit him in the head with the hoe, and then rifled through his pockets looking for money, ultimately finding and taking a single dollar from him. Duarte was the only direct witness to the robbery.

With that perspective in mind, we examine Deputy House's testimony. Deputy House reported that Agnew confessed to him that the fight was "over a dollar." This testimony constituted substantive evidence of Agnew's guilt. It contradicted Agnew's in-court description of the incident in two important ways. First, it revealed that the altercation was not related to which party had the right to use a pre-paid gas pump, casting doubt on Agnew's version of who struck the first blow. Second, it verified that Agnew took money from Duarte, one of the elements of robbery the State was required to prove. The Deputy's testimony could not be characterized as "confined to some uncontroverted or merely formal aspect of the case for the prosecution." Turner, 379 U.S. at 473. Rather, the testimony related to the central issue in the case, whether a robbery occurred or whether Agnew was simply defending himself in a fight over the right to use a particular gas pump.

Indeed, both Turner and Gonzales are on point here, because in both of those

cases, the officers who served dual roles as sheriffs and bailiffs testified about alleged confessions by the defendants. In each case, the Court characterized the bailiffs as "key witnesses" for the prosecution under circumstances indistinguishable from Agnew's case. Turner, 379 U.S. at 473; Gonzales, 405 U.S. at 1055. The prosecution certainly drove home the importance of this testimony by mentioning it repeatedly in closing arguments and characterizing it as an admission that Agnew had robbed Duarte. Moreover, Deputy House testified in uniform, and the prosecutor drew attention to the fact that this was the same deputy who had shepherded the jury the previous day. Thus, both of the elements of Turner were present: the deputy had a special relationship with the jury, and he provided key testimony relating to substantive evidence of the defendant's guilt.

C.

The government argues that Agnew has twisted the rule announced in Turner to imply that prejudice is inherent when an officer of the court testifies regarding issues that are material to the prosecution. Citing an Eleventh Circuit case, the government urges us to find that there is no per se rule requiring reversal in these circumstances, and that prejudice must be shown when the contact between the court officer and the jury is de minimis. See Johnson v. Wainwright, 778 F.2d 623 (11th Cir. 1985), cert. denied, 484 U.S. 872 (1987). The government's application of Johnson to the facts of Agnew's case stretches the principle past the breaking point. In Johnson, the sheriff acted as a bailiff at trial, and also assisted the prosecution by investigating the crimes and aiding counsel during jury selection. 778 F.2d at 626. The Eleventh Circuit agreed that Turner and Gonzales were relevant in analyzing the dual role of the sheriff. The court acknowledged that the bailiff's exercise of his official duties likely gave him added legitimacy in the eyes of the jury, and that the bailiff's participation in the prosecution of the case created at least the potential for prejudice. The court refused to subscribe to a per se rule of reversal, however, without considering how central a role the bailiff played in

the proceedings:

When either the individual's official contact with the jury or his participation in the prosecution is so minimal in the jurors' eyes as to have a de minimis impact on the jury's deliberations for all apparent purposes, some showing of actual prejudice must be made.

778 F.2d at 627. The court found that Johnson's trial was such a case. The bailiff did participate in the pretrial investigation, his name came up in the testimony of several prosecution witnesses and he aided in the selection of the jury. However, he never took the witness stand and there was no evidence that the jury was aware that he participated in the jury selection process. Id. Given that his participation in the state's presentation of its case was at most peripheral so far as the jury could tell, the court found that more than speculation about prejudice was needed; it required the defendant to demonstrate actual prejudice. Id. Johnson is clearly distinguishable from Agnew's case. In Johnson, the bailiff never testified and thus his credibility was never at issue. In contrast, both Turner and Gonzales dealt with bailiffs who testified at trial, as the bailiff did here. Although we cannot tell from the opinion in Johnson the context in which the sheriff's name was mentioned byprosecution witnesses, it is clear that the sheriff's credibility was not at issue. Thus, any special confidence the jury developed in him because of his caretaking role was irrelevant to their assessment of the defendant's guilt.

Similarly, the government's citation to Johnson v. Dugger, 932 F.2d 1360 (11th Cir. 1991), cert. denied, 502 U.S. 961 (1991), is inapposite. This case was a follow-up to Johnson's earlier appeal, where Johnson claimed to have new evidence of actual prejudice. The government cites Dugger for the proposition that "The central issue with respect to actual prejudice is whether the actions of the sheriff through his responsibilities as bailiff have undermined the impartiality of the jury." 932 F.2d at 1366. Although we have no quarrel with that general proposition, a defendant need prove actual prejudice

only where the bailiff's contact with the jury is de minimis or the bailiff's testimony involves some merely formal aspect of the case. When the bailiff's contact is extensive and the testimony addresses substantive issues of the defendant's guilt, prejudice is presumed.

D.

The government finally contends that even if the trial court erred in allowing Deputy House to testify after he had served as bailiff, the error was harmless. Neither party briefed the issue of whether this is the type of constitutional error subject to harmless error analysis, or whether it should be treated as a structural error. In both Turner and Gonzales, the Supreme Court granted the writ without considering whether the error was harmless. Nevertheless, we need not decide today whether the error is structural because we find in any event that it was not harmless. Constitutional error is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Neder v. United States, 527 U.S. 1, 15-16 (1999) (citing Chapman v. California, 386 U.S. 18 (1967)). In determining whether error was harmless, we look to such factors as (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) whether other evidence corroborated or contradicted the witness' testimony; and (4) the overall strength of the prosecution's case. United States v. Ochoa, 229 F.3d 631, 640 (7th Cir. 2000); United States v. Castelan, 219 F.3d 690, 696 (7th Cir. 2000). The government bears the burden of demonstrating that constitutional error is harmless beyond a reasonable doubt. Castelan, 219 F.3d at 696.

Reviewing these factors, a confession was certainly important to the prosecution's case. Agnew had pleaded self-defense, and that testimony was contradicted only by the victim. Deputy House was the only witness to Agnew's alleged confession, and so the Deputy's testimony was not cumulative in any sense. Because no one else witnessed the confession, the Deputy's testimony was not corroborated, although there was

evidence from Duarte and Hill that corroborated the content of the alleged confession. Finally, the case against Agnew was weak enough that the prosecutor risked the validity of the verdict by putting Deputy House on the stand to rebut Agnew's explanation of the incident. Reviewing these factors as a whole, and considering the Supreme Court's conclusion that the prejudice of such testimony is inherent, we find that the error was not harmless.

III.

   Because the bailiff's contacts with the jury were of a continuous and intimate nature typical of the bailiff/jury relationship, and because Deputy House's testimony constituted substantive evidence of Agnew's guilt, the trial court should have granted a mistrial to avoid the extreme prejudice inherent in those circumstances. Agnew is thus entitled to habeas corpus relief. For that reason, we reverse the judgment of the district court and remand this case to the district court with directions to issue an order granting the petition for a writ of habeas corpus, unless the State of Illinois provides Agnew with a new trial in accordance with this opinion within 120 days. Because we reverse on this ground, we need not address any of Agnew's other arguments in support of reversal.

REVERSED AND REMANDED.

FOOTNOTES

/1 We take the facts regarding the manner in which the trial was conducted from the record and from the opinion of the Illinois Appellate Court in Agnew's direct appeal. See People v. Agnew, 548 N.E.2d 1139 (Ill. App. 2 Dist. 1989).

/2 Of course, as we will discuss later, there is no indication in the record that Deputy House did not provide lunch to the jurors, accompany them to lunch, provide personal services to them, or converse with them. Although the trial judge was closer to the events of the day and a direct observer of activities in the courtroom, the issue here, as we shall see, ultimately turns on what may have happened outside the courtroom, out of the view of the trial judge.

/3 The jury had also been exposed to a newspaper article about the case, printed after delibera-

tions were underway, which declared, "If he is not found guilty of murder he will be a lucky man, for the evidence against him was very strong, or, at least, appeared to be to an outsider." 146 U.S. at 143. The article also described the State's closing argument as "so strong that the friends of Mattox gave up all hope of any result but conviction." 146 U.S. at 143. The article portrayed Mattox's mother as appearing pale, with her face indicating very little hope, and credited her with standing by her son through all of his difficulties, including having "been tried for his life once before." 146 U.S. at 143-44.

/4 One of the deputies testified that he knew most of the jurors before the trial, and that during the trial, he made new acquaintances with the one or two he did not know. 379 U.S at 469 n.6. Turner did not object to the fact that the deputy was acquainted with a number of jurors before the trial began, and the Supreme Court did not discuss this additional problem.

/5 The case also drew a dissent by two justices, who characterized the contact between the bailiff and the jury as closer to a brief encounter than a continuous and intimate association. The dissent also noted that the trial took place in a small town, and that the sheriff was already acquainted with every member of the jury. 405 U.S. at 1059. The dissent also found determinative that Gonzales never objected to the sheriff's dual role. 405 U.S. at 1060.