In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3532

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT SCOTT,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99-CR-30043--Richard Mills, Judge.

Argued December 6, 2001--Decided March 26, 2002

   Before CUDAHY, EASTERBROOK, and EVANS,
Circuit Judges.

   EVANS, Circuit Judge.  Robert Scott,
along with assorted others, was indicted
for conspiracy to possess marijuana and
cocaine with intent to distribute. At
Scott's first trial, in 1999, the jury
failed to reach a verdict, and the judge
declared a mistrial. A second trial did
not have a happy ending for Mr. Scott--he
was convicted. That trial lasted 2 weeks
and saw a cavalcade of witnesses,
testimony, and physical evidence. As much
as we'd like to inscribe pages and pages
of the Federal Reports with details of
the drug transactions presented to the
jury, we're not going to. We'll shoot for
six paragraphs, stating the evidence in
the light most favorable to the
government.

   From late 1991 to the fall of 1993,
Billy Scott (Robert Scott's brother),
Billy's girlfriend, Molly Rahar, and (for
a couple of months) Tim Burnett drove
from Taylorville, Illinois, to Chicago to
purchase marijuana and cocaine from
Charles Kelsay. From mid-1993 until July
2, 1994, Shawn Jones and Burnett drove
from Taylorville to Chicago to purchase
marijuana and cocaine from Kelsay.
Although Robert Scott did not go on these
road trips, the government suspected he
was one of their masterminds.

With regard to the first portion of the conspiracy, Rahar testified that prior to going to Chicago to purchase drugs from Kelsay, Billy Scott and she would meet with Scott, who would give his brother thousands of dollars and discuss what drugs to get./1 After returning to the Taylorville area from Chicago they would drop off the drugs at a lake lot rented by Scott. Burnett, whom Billy Scott eventually hired as his driver, testified that if they brought the drugs to either his own house or Billy Scott's, Scott would come by, pick up his marijuana and cocaine, and leave, taking "[j]ust about all of it." Unfortunately for Scott, as both Rahar and Burnett testified, Billy Scott was a heavy drug user and became an unreliable courier.

Enter Shawn Jones. Jones, a neighbor and friend of Scott's, testified that he had been going to Chicago with various people to obtain drugs from Kelsay. Starting in late 1992 Jones pooled his money with Ron Cooper, who previously had been obtaining drugs from both Jones and Billy Scott. Jones would travel to Chicago, sometimes sharing a motel room with Billy Scott, Rahar, and Burnett. In mid-1993 Jones hired Burnett as his driver.

After his falling out with his little brother, Scott turned to Jones. Jones refused to testify at trial so the government introduced grand jury testimony that Jones had given against Scott in December of 1995--more on that in a moment. Jones confirmed that Scott was Billy Scott's "money man" during Billy Scott's trips to Chicago and that, after the Scott family feud, Jones agreed to get drugs for Scott from Kelsay. Scott gave him between $5,000 and $10,000 for these purchases; Jones offered the precise amounts that Scott gave him on the last few trips prior to Jones' arrest. Burnett witnessed money exchanges between Jones and Scott. Jones said that Scott sometimes paid for the hotel room in Chicago, and phone records, corresponding in time to stays in Chicago motels, showed calls to the Scott residence and Scott's tavern. Burnett and Karen Jones (Shawn Jones' wife) remembered Shawn calling Scott to let him know if there were problems or if they were running late. In Chicago, Kelsay often fronted marijuana and cocaine to

Jones and Burnett. There was testimony that Scott would pick up marijuana and cocaine after Jones and Burnett returned from Chicago; some of the drugs went to Cooper. The Jones-Burnett trips to Chicago ended on July 2, 1994, shortly before Scott's Fourth of July lake lot party, when Burnett and Jones were arrested on their way back from Chicago and found with large amounts of marijuana and cocaine.

The investigation into the drug conspiracy did not immediately lead to Robert Scott, who was not indicted until June of 1999. Scott was detained at Sangamon County jail before being released. He violated the terms of his release, however, and returned to Sangamon in September 1999. During this second visit, Scott made friends with Billy Chance (remember that name), who was awaiting sentencing after pleading guilty to armed bank robbery./2 Chance testified that Scott told him that Billy Scott and Rahar had been going to Chicago three or four times a month and buying drugs for him from Kelsay. Scott said that he had Jones take over the drug runs after Billy started ripping him off. He would give Jones $10,000-$15,000 for the drugs, which Jones would deliver to him. Scott also showed Chance a list of phone calls the government was going to use against him. He told Chance the calls were "about the drug transactions that Jones had made."

Lest anyone wonder how Scott could have stored all the drugs he was obtaining, the government also presented evidence on his distribution practices. According to Rahar, during the first part of the conspiracy Scott was fronting drugs to his brother to sell. Angela Sparling testified that she twice purchased cocaine from Scott. Steve Harness testified to purchasing (or being fronted) large amounts of marijuana from Scott from spring to fall of 1993. With regard to the second part of the conspiracy, Jones testified that he saw Bob Oller give money to Scott for drugs a few times. Scott also had Jones pick up an ounce of cocaine that went to Oller. Jones also said that he stopped at Alan Williams' car dealership in Decatur, Illinois, a couple of times to pick up money that Williams owed to Scott for drugs. Louis Ferratier, who rented a lake

lot near Scott's, testified to buying cocaine from Scott four times in June of 1994. Last, Chance testified that Scott told him that he had sold drugs at his lake lot and during pool tournaments.

On appeal, Scott raises five points, four of which will not make it out of this paragraph. First, he argues there was insufficient evidence to convict him, a contention answered by the difficulty of winning a sufficiency challenge and the evidence (which we have briefly summarized) presented at trial. Although the evidence was hotly contested--there was direct contrary testimony and no shortage of prior convictions, cooperation agreements, and drug use with which to impugn the credibility of government witnesses--we defer to the jury's credibility determinations. Second, Scott argues that the district court erred by failing to give buyer-seller and multiple-conspiracy instructions. Scott did not request such instructions and there was no plain error in not giving them. Third, Scott argues, citing the oft-cited decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), that the district judge erred by failing to instruct the jury that it needed to find both the types and amounts of drugs involved in the conspiracy. Again, Scott did not request such an instruction and, even though the government concedes error, we agree, given the evidence in the record, that the error was harmless. Fourth, Scott claims he received ineffective assistance of counsel. Because Scott has new counsel on appeal and insists on going ahead, we will consider his ineffective assistance claim, even though, in the absence of an evidentiary hearing, his claim is all but doomed. United States v. Godwin, 202 F.3d 969, 973 (7th Cir. 2000). As we see it, nothing in the record rebuts the presumption that counsel's performance was reasonable, so we reject the ineffectiveness claim.

But Scott has thrown one dart that is at least heading for the board. He challenges the admission of Shawn Jones' December 1995 grand jury testimony. Jones provided the testimony after he was convicted but before he was sentenced on charges stemming from his 1994 arrest. After giving the testimony, Jones refused to testify during a second appearance

before the grand jury. He also refused to testify at both of Scott's trials. The district judge found him "unavailable" after his refusal to testify at the second trial. Upon the government's motion, the judge admitted the grand jury testimony after holding an evidentiary hearing.

There can be little doubt that Jones' testimony was important. Jones not only confirmed that Scott was Billy Scott's "money man" but also testified that Jones accepted large amounts of money from Scott for the purpose of buying drugs from Kelsay. Morever, he testified that Scott sometimes paid for his hotel room in Chicago and that he not only delivered the drugs to Scott but also delivered drugs to and picked up money from Scott's customers. This was powerful testimony in a conspiracy case. We also note that Scott's first jury did not hear Jones' testimony.

There are two independent hurdles to admitting out-of-court statements in federal courts: the Sixth Amendment's Confrontation Clause and the Federal Rules of Evidence. It is, of course, well-established that a defendant forfeits his Confrontation Clause rights by wrongfully procuring the unavailability of a witness. United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999). The doctrine was codified with regard to hearsay in 1997 with the adoption of Federal Rule of Evidence 804(b)(6). United States v. Ochoa, 229 F.3d 631, 639 (7th Cir. 2000). We need not worry about any potential differences between the substantive forfeiture standards or standards of review under these two provisions because Scott has not raised a Confrontation Clause issue. He styles his challenge under Rule 804(b)(6). Accordingly, we will review the district court's determination under Rule 804(b)(6) for clear error. Cf. United States v. Irorere, 228 F.3d 816, 824 n.1 (7th Cir. 2000) (applying clear error standard to predicate determination of whether defendant was a member of a conspiracy for purposes of admitting coconspirator statements under Fed. R. Evid. 801(d)(2)(E)).

Federal Rule of Evidence 804(b)(6) provides that if the declarant is unavailable, a statement is not excluded

as hearsay if it is "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." To admit a statement against a defendant under the rule, therefore, the government must show (1) that the defendant engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability. The district judge required the government to establish these elements by a preponderance of the evidence. Although we have not directly addressed the level of burden to be carried by the government under Rule 804(b)(6), Ochoa, 229 F.3d at 639 n.2, we join the other circuits which have held that the preponderance-of-the-evidence level is correct. See United States v. Houlihan, 92 F.3d 1271, 1280 (1st Cir. 1996) (and cases cited therein).

At the evidentiary hearing, the government offered different pieces of evidence regarding Scott's interactions with Jones. First, it submitted transcripts of phone conversations between Scott and Jones occurring in 1998 while Jones was incarcerated and Scott was the target of a grand jury investigation. It also offered prison records showing that Scott and his wife visited Jones in prison in February 1998. Second, it offered testimony that Scott and his wife gave Jones $200 and gave his son a toy laptop computer for Christmas in 1998. Third, it offered the testimony of Mr. Chance, who we recall was in the same cellblock with Jones at Sangamon in the spring of 1999; Chance and Scott were on the same cellblock in the fall of 1999 and shared a cell for a few days. Chance testified to their interactions.

As the government seems to concede, only Chance's testimony has much force. The transcripts of the Jones-Scott phone conversations are fairly mundane and only touch on subjects that could be construed (and they must be construed broadly) as coercive, influential, or even persuasive. In fact, Jones placed the calls to Scott. Moreover, although giving something of value to a potential witness could constitute wrongdoing, there is no indication that Scott (or his wife) gave Jones money or gave the son a gift with the intent of procuring his

unavailability. The record establishes that the Joneses and Scotts were longstanding friends.

But Chance's testimony reveals that Scott did not think that friendship alone would carry the day. According to Chance, Scott and Jones communicated at Sangamon both in June of 1999, shortly after Scott's indictment, and in the fall of 1999, in the months preceding Scott's first trial. June is useful background. After Scott's arrival, Jones seemed "nervous" and "frightened." Jones identified Scott as the person the government wanted him to testify against and told Chance that "he had a lot to lose and he had to protect himself." Chance observed Jones and Scott communicate through their adjacent cell blocks, out of sight of security cameras, regularly while Scott was there.

In the fall, Scott told Chance that Jones had damaging information. Scott said that "if [Jones] knew what was good for him, he'd keep his mouth shut" and that Jones "better not testify if he knew what was good for him." Scott also told Chance that he learned from his lawyer that the government had approached Jones and told him that it would drop his contempt charges and further reduce his sentence if he testified. Chance had seen Jones in the Sangamon law library, and Scott had Chance tell Jones what his lawyer had told him and ask him whether he was going to testify. When Chance brought up the subject, Jones "looked real nervous and scared." Nonetheless, Jones told Chance (who told Scott) that he was not going to testify. But hearing it from Chance was not good enough for Scott, who asked Chance how to obtain permission to use the law library. He then ventured to the library to "make sure [Jones] was not going to testify again." He did so even though he had told Chance on a few occasions that he was worried the government would use his communication with Jones against him. Chance testified that they talked in a "low tone of voice."/3 Afterwards, Scott was "happy" and "seemed relieved that Jones wasn't going to testify."

Rule 804(b)(6) requires, first, that Scott engage in "wrongdoing." That word is not defined in the text of Rule 804(b)(6), although the advisory

committee's notes point out that "wrongdoing" need not consist of a criminal act. One thing seems clear: causing a person not to testify at trial cannot be considered the "wrongdoing" itself, otherwise the word would be redundant. So we must focus on the actions procuring the unavailability. Scott argues his actions were not sufficiently evil because they were not akin to murder, physical assault, or bribery. Although such malevolent acts are clearly sufficient to constitute "wrongdoing," they are not necessary. See 30B Michael R. Graham, Federal Practice & Procedure sec. 7078 (Interim ed. 2000) ("Rule 804(b)(6) is an attempt to respond to the problem of witness intimidation whereby the criminal defendant . . . through one means or another, often a simple telephone call, procures the unavailability of the witness at trial . . . ."). The notes make clear that the rule applies to all parties, including the government. Although, in the ugliest criminal cases, murder and physical assaults are all too possible on the defendant's side, it seems unlikely that the rule was needed to curtail government murder of potential witnesses. Rather, it contemplates application against the use of coercion, undue influence, or pressure to silence testimony and impede the truth-finding function of trials. We think that applying pressure on a potential witness not to testify, including by threats of harm and suggestions of future retribution, is wrongdoing./4 Cf. Steele v. Taylor, 684 F.2d 1193, 1201 (6th Cir. 1982) (noting that wrongful conduct includes the use of force and threats, and "persuasion and control" by a defendant).

Scott does not challenge the facts as related by Chance, so what we have is a battle of inferences and, although it is close, we do not believe that the district judge erred by inferring that Scott coerced Jones. First, Scott told Chance what he intended to do in the library; he wanted to "make sure [Jones] was not going to testify again"--this after threatening that Jones should "keep his mouth shut" and "better not testify if he knew what was good for him." The district judge could reasonably infer that Scott did exactly what he told Chance he would do. Second, there is no dispute that Scott had a golden

opportunity to coerce Jones. He had a 20-minute conversation with Jones in Sangamon's law library where, likely not out of respect for library policy, they spoke in "low" tones. Third, Scott's reaction to the meeting was positive. He seemed "happy" and "relieved" that Jones would not testify, after previously worrying about it. All of this took place against a backdrop in which Jones was "frightened" by Scott's presence and feared that he had "to protect himself."

In considering this evidence, we are also mindful that there is another potential source of information about the conversation between Scott and Jones: Jones. But Jones gave no testimony at the evidentiary hearing. It seems almost certain that, in a case involving coercion or threats, a witness who refuses to testify at trial will not testify to the actions procuring his or her unavailability. It would not serve the goal of Rule 804(b)(6) to hold that circumstantial evidence cannot support a finding of coercion. Were we to hold otherwise, defendants would have a perverse incentive to cover up wrongdoing with still more wrongdoing, to the loss of probative evidence at trial. We hold that the district judge did not clearly err by finding that Scott had engaged in wrongdoing.

Rule 804(b)(6) requires, second, that Scott's wrongdoing was intended to procure Jones' unavailability. On this point the evidence is clear. Chance testified that Scott threatened that Jones "better not testify if he knew what was good for him." Moreover, Scott wanted access to the law library to "make sure" that Jones would not testify. The district judge properly found that Scott's wrongdoing was intended to procure Jones' unavailability.

Third, the rule requires that Scott's wrongdoing procure Jones' unavailability. This is another close issue. Jones first refused to testify in January 1999 when he appeared again before Scott's grand jury. Thus, it may be difficult for the government to show that Scott's conduct at Sangamon procured Jones' unavailability since Jones had refused to testify over 8 months earlier.

But our task is to measure Jones'

refusals to testify at trial and, by that point, Scott had been thrown from thefrying pan into the fire. He was no longer a target of an investigation but a criminal defendant. The government had upped the ante on Jones' testimony and Scott knew it. Scott told Chance that he "couldn't believe" the government was going to call Jones to testify. He had assumed the government was going to present Jones' grand jury testimony, which Scott and Jones were trying to have thrown out. Further, Scott thought that the government was applying new leverage. According to what he told Chance, he believed the government was offering to drop Jones' contempt charges and further reduce his sentence in exchange for testimony. This prompted Scott to ask Chance, despite his worries of government surveillance, to find out whether Jones was going to testify. Even after Jones said he was not going to testify, Scott was still worried, so worried that he himself went to the law library to find out if Jones was really going to testify. Only at this point, after which coercion was inferable, was Scott "happy" and "relieved" that Jones would not testify. For his part, Jones alluded to religious and moral reasons for not testifying, which he had not relied upon before. Given his vacillating excuses, we think the district judge did not clearly err in concluding that Scott's influence was the real reason for Jones' unavailability.

Scott argues that, even if Jones' testimony was admissible under Rule 804(b)(6), its probative value was substantially outweighed by unfair prejudice under Federal Rule of Evidence 403. Scott asserts that he was incriminated by unreliable evidence. To the extent this argument depends on the right of cross-examination, the argument is unavailing. The whole point of Rule 804(b)(6) is to admit evidence without cross-examination because, by a defendant's wrongdoing, he forfeits his right to challenge the receipt in evidence of the statements. Moreover, the hearsay statements here were sworn and given before a grand jury. The unfair prejudice to Scott of admitting these statements was, as the district court found, outweighed by its considerable probative value in this case.

The judgment of the district court is

AFFIRMED.

FOOTNOTES

/1 Billy Scott had come to know Kelsay through Norman Engebretsen, whom he met while working in Chicago. Prior to the dates of the alleged con- spiracy, Engebretsen had sold marijuana. He tes tified that he obtained the marijuana from Billy Scott and that, on different occasions, Billy Scott made it known to him that his brother was in charge of dispensing the drugs. Engebretsen eventually connected the Scotts with a cocaine source in Chicago--Kelsay.

/2 Chance must have been the friendly type. Chance had met Jones in December 1998 at a correctional facility and bumped into him again in March of 1999 when they were housed in the same cell block at Sangamon. Scott was in the adjacent cell block for a week or so in June (his initial detention).

/3 At trial, Chance added that the conversation lasted 20 minutes.

/4 Nothing in our decision in Ochoa is to the contrary. In that case, the government presented evidence that one of the defendant's former tenants, a potential witness, had made at least one telephone call from the defendant's phone while the government was trying to locate him. The court held that "permitting a witness at one's upcoming trial to use a phone, without more, is not a culpable act." 229 F.3d at 639. Scott's case involves threats and coercion.