OPINION
{¶ 1} Defendant-appellant Robert Boyes appeals his conviction and sentence from the Licking County Court of Common Pleas on one count each of arson, complicity to commit insurance fraud, receiving stolen property, having weapons while under disability with a firearm specification, tampering with evidence with a firearm specification, and murder and two counts of falsification. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 17, 2001, a truck belonging to David Kendall, a former police officer, was discovered burning off the road in Licking County. An accelerant had been used to set the same on fire. It was discovered that the truck, which Kendall had reported stolen, had been taken by appellant's son and that the "theft" of the same was a contrived arrangement between appellant's son and Kendall. Benjamin Thompson, through his relationship with Kendall and appellant's son, learned the details of the theft, arson and subsequent insurance fraud and provided information to police that appellant had been involved.
 {¶ 3} Subsequently, on March 3, 2002, a house in Coshocton County, Ohio, also was destroyed due to arson. The house had been rented to appellant's son and his girlfriend. The police, through Benjamin Thompson, learned that appellant and his son, among others, were involved in setting the house on fire. After giving statements to the police, Thompson was subpoenaed to appear and testify before the Coshocton County Grand Jury on June 21, 2002.
 {¶ 4} As a result of the above two incidents, on June 28, 2002, the Licking County Grand Jury indicted appellant in Case No. 2002CR305 on one count each of arson in violation of R.C. 2909.03(A)(2), a felony of the fourth degree, complicity to commit insurance fraud in violation of R.C.2913.47(B)(1) and R.C. 2923.03(A)(1) and/or (A)(2) and/or (A)(3), a felony of the fourth degree, receiving stolen property (over $500.00) in violation of R.C. 2913.51(A), a felony of the fifth degree, and having weapons while under disability in violation of R.C. 2923.13(A)(2)(B), a felony of the fourth degree. The charge of having weapons while under disability contained a firearm specification. The Grand Jury also indicted appellant on one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree, also with a firearm specification, and two counts of falsification in violation of R.C.2921.13(A)(3), both misdemeanors of the first degree. At his arraignment on July 9, 2002, appellant entered a plea of not guilty to the charges contained in the indictment.
 {¶ 5} Thereafter, on August 23, 2002, appellant filed a Motion in Limine. Appellant, in his motion, specifically requested that the trial court exclude all statements made by Benjamin Thompson, "in that Mr. Thompson is deceased and unavailable to testify." Thompson's body had been found along a highway on June 17, 2002, shortly after he had received a subpoena for his appearance before the Grand Jury. He had been shot several times in the head. On September 24, 2002, appellee filed a "Notice Pursuant to Evidence Rule 804(B)(6)", stating that it intended to seek the admission of the statement that Thompson had given to the Heath Police Department on June 3, 2002. Thompson, in such statement, which had been provided to appellant in the course of discovery, implicated appellant and his son in the theft and destruction (by arson) of the truck and the subsequent insurance fraud and in the arson of the residence in Coshocton, Ohio.
 {¶ 6} As a result of Thompson's death, on October 18, 2002, the Licking County Grand Jury indicted appellant in Case No. 2002CR479 on one count of murder in violation of R.C. 2903.02(A), a first degree felony, with a firearm specification. Upon motion of the State, the trial court consolidated the two cases.
 {¶ 7} An oral hearing on appellant's Motion in Limine was scheduled for February 29, 2003. Prior to the testimony, the following stipulation was read into the record:
 {¶ 8} "1. The documents marked as State's Exhibits 1-A through 1-C summarize, are transcripts of, or are actual written statements of, Benjamin Thompson given prior to his death and are the statements that the State of Ohio is seeking to have ruled admissible pursuant to Evid. R. 804(6) through the instant proceedings.
 {¶ 9} "2. On June 17, 2002, at approximately 6:40 p.m. the body of Benjamin Thompson was found by civilians in or near a ditch along Hardscrabble Road, near Johnstown, Licking County, Ohio. The area of where the body of Benjamin Thompson was found is depicted in the photographs marked as State's Exhibits 2-A through 2-G. Mr. Thompson's body was found in the ditch near where the bloodstains on the roadway can be seen in States Exhibit 2-A.
 {¶ 10} "3. Had he been called to testify, Dr. Jeffrey Lee, a qualified expert forensic pathologist, would have testified that Mr. Thompson died as the result of gunshot wounds to the head. He would have further testified that State's Exhibit 3 is a photograph that was taken to demonstrate the approximate trajectory of the four bullet entrance wounds to Mr. Thompson. He would have further testified that the four bullets removed from Mr. Thompson at autopsy are numbered as Bureau of Criminal Identification and Investigation (BCI) submitted item 5.
 {¶ 11} "4. Had he been called to testify, Forensic Scientist Ron Dye, a qualified expert on ballistics employed by BCI would have testified that the Ruger 10/22 semi-automatic rifle shown in State's Exhibits 4-G and 4-H [numbered as BCI submitted item A7] was examined and determined to be fully operational. Furthermore, he would have testified that two live .22 caliber shells found near Mr. Thompson's body (shown in States Exhibit 2-C), and one live .22 caliber shell found on the back driver's side floorboard of a White Plymouth Acclaim (shown in State's Exhibit 4-F) [numbered as BCI submitted items 1, 2, and A8] were examined and all found to have extractor marks that have some similarities with each other indicating that they could have been in the same gun at some point in time but that the similarities in the extractor marks are not such that a definitive conclusion can be drawn on this point. Each of these bullets are Federal-brand .22 caliber copper-coated rimfire cartridges.
 {¶ 12} "Dye would have further testified that the Ruger 10/22 semi-automatic rifle shown in State's Exhibits 4-G and 4-H does not appear to leave extractor marks that are of a definitive enough nature so as to identify the three bullets shown in State's Exhibits 2-C and 4-F as having been in this rifle although he cannot exclude that possibility.
 {¶ 13} "Dye would have further testified that four bullets removed from the body of Mr. Thompson [again, numbered as BCI submitted item 5] were badly deformed. However, he can determine from one of these bullets that it is a copper-coated, .22 caliber rimfire bullet.
 {¶ 14} "Dye would have testified that he examined four spent shell casings recovered at the defendant's home near Warsaw, Ohio which are shown in State's Exhibits 5-A through 5-E, [numbered as BCI submitted items F1 and F2]. These casings are all .22 caliber Federal-brand rimfire bullet casings. In addition, based upon the firing pin impressions present on them, Dye would testify that these bullets were fired in the Ruger 10/22 semi-automatic rifle shown in State's Exhibits 4-G and 4-H [again, numbered as BCI submitted item A7]."
 {¶ 15} Thereafter, the following testimony was adduced at the hearing.
 {¶ 16} Detective Richard Brownley of the Licking County Sheriff's Office testified that, on June 17, 2002, at approximately 8:30 p.m., he went to Hardcastle Road in Licking County in response to a page that a body had been discovered at that location. The body was that of Benjamin Thompson. By the time that he arrived on the scene, the body had been removed but areas of suspected blood remained on the roadway. The Detective recovered a red ball cap, a lighter, two .22 caliber cartridges and a piece of gray cloth with blood on it from the scene. The Detective, who testified that he had heard that two pennies, one heads up and the other heads down, were found on the victim's body, also found two pennies at the scene and found a beige ball cap up on an embankment leading up from the roadway. According to Detective Brownley, the beige ball cap was approximately eleven feet from the suspected bloodstains. The bullets and two ball caps found at the scene were submitted to the Bureau of Criminal Identification for processing along with a swabbing from appellant and from the victim.
 {¶ 17} The Detective further testified that he took custody of a newspaper article that had been removed from Thompson's clothing. The article was captioned "Case against Heath policeman [David Kendall] likely to go forward."
 {¶ 18} During direct examination, Detective Brownley was questioned about his involvement in the processing of a white Plymouth Acclaim that the police had located and taken into custody in Knox County Ohio. The Detective, who was involved in the processing during the evening of June 18, 2002, testified that there was a large amount of what was suspected to be blood on the passenger side door panel and on the armrest area and that "there appeared to be blood splatter of the right, front inside windshield area." Transcript of February 28, 2003, hearing at 37. Samples of the suspected blood were sent to a state laboratory for analysis. In addition, a .22 caliber cartridge was located on the floor board of the Plymouth Acclaim. The following testimony was adduced when the Detective was asked whether the he noted any similarities between the cartridges found at the scene and the one found in the car:
 {¶ 19} "They do appear to be of the same manufacturer, as both had an F head stamp on the cartridge casing, which is demonstrative of Federal Firearms Manufacture. And both projectiles seemed to be of the same coating, a copper-type coating, and both seemed to be of the same design of a hollow point design." Transcript of February 28, 2003, hearing at 38. The cartridges were submitted to the Bureau of Criminal Identification and Investigation. The Detective further testified that he found a .22 caliber Ruger semi-automatic in the Acclaim's trunk and that the cartridges in the magazine removed from such weapon appeared to be "Federal cartridges and the F stamp on the head. And the projectiles appear to be of the same of the other projectiles." Transcript of February 28, 2003, hearing at 39-40. The projectiles were copper-coated. Detective Brownley testified that one of the projectiles removed from Thompson's body appeared to be copper-coated and that the others were too fragmented to tell.
 {¶ 20} While he did not participate in the search of appellant's residence, the Detective testified that he took into custody property collected by other officers at the residence. The property taken included four spent casings and both the originals and copies of newspaper articles. While one of the articles was captioned "Heath officer appears in court for hearing," the other was captioned "Heath officer charged with obstructing justice in Coshocton County arson case."
 {¶ 21} The next witness to testify at the hearing was Steven Wiechman, a qualified expert in the area of DNA testing who works for the Ohio Bureau of Criminal Identification and Investigation.[1] Wiechman testified that the stain on the fabric on the front passenger side door of the Acclaim and two samples from each the beige and red baseball caps were submitted for testing. According to Wiechman, "the partial DNA profile from the cutting of the hat band of the beige ballcap . . . is consistent with Robert Boyes [appellant]." Transcript of February 28, 2003, hearing at 79. The following testimony was adduced when Wiechman was questioned about the cutting from the band:
 {¶ 22} "Q. Okay. Now, that cutting from the band of that beige ballcap, does that give you a — an indication of the likelihood that the DNA in the cutting from the band is from the wearer of that hat?
 {¶ 23} "A. Given the location, being the band, yes, that could be a good indicator that that was probably the person wearing that hat.
 {¶ 24} "Q. On that same ballcap, but marked as B3.2, is a cutting from some stain on the cap?
 {¶ 25} "A. Correct.
 {¶ 26} "Q. Okay. What was the conclusion with respect to this stain?
 {¶ 27} "A. That was consistent with Ben Thompson.
 {¶ 28} "Q. And this — the word stain suggests that it — it's what?
 {¶ 29} "A. It was from, I think, the actual portion of the hat.
 {¶ 30} "A. Correct.
 {¶ 31} "Q. You didn't see the hat; correct?
 {¶ 32} "A. I did not.
 {¶ 33} "Q. And that conclusion, with respect to the DNA and that stain on that beige ballcap, is consistent with what standards submitted to you or —
 {¶ 34} "A. That was consistent with Ben Thompson." Transcript of February 28, 2003, hearing at 86-87. Wiechman further testified that the stain on the fabric from the passenger side door also was "consistent with Ben Thompson." Transcript of February 28, 2003 hearing at 88.
 {¶ 35} The final witness to testify at the February 28, 2003, hearing was Detective Eric Rardain of the Heath Police Department. Detective Rardain testified that, in May of 2002, he interviewed Ben Thompson as part of an investigation into crimes that had occurred in Licking County and the City of Heath. The following is an excerpt from the Detective's testimony:
 {¶ 36} "Q. Okay. Did you have occasion, as part of that investigation, to participate in any interviewing with the individual by the name of Benjamin Thompson?
 {¶ 37} "A. Yes, sir, I did.
 {¶ 38} "Q. Okay. And just the reason for that interview:
 {¶ 39} "A. We had been investigating some crimes in Licking County and in the City of Heath in the — part of that investigation had led us to Dave Kendall. Mr. Kendall was subsequently arrested for a warrant out of Coshocton County. And in our interview with Mr. Kendall we learned of Mr. Thompson's involvement in some of the crimes, such as an arson in Coshocton and an incident involving a — a truck from Johnstown.
 {¶ 40} "Q. Okay. Did you have occasion, then, as a result of that to talk to Mr. Thompson about his involvement and/or his version of events as to other people's involvement?
 {¶ 41} "A. Yes, sir, I did." Transcript of February 28, 2003, hearing at 117. According to the Detective, Thompson implicated both appellant and his son in the offenses.
 {¶ 42} Detective Rardain further testified that Jennifer Moran told him that a white Plymouth Acclaim arrived at her home in Knox County, Ohio, at approximately 7:30 p.m. on June 17, 2003, and that she saw appellant get out of the same. The police located the vehicle at the Moran house on June 18, 2002. Detective Rardain testified that there was a large amount of blood in the car. During a search of appellant's home, Detective Rardain found newspaper articles related to the investigation on a table in the kitchen.
 {¶ 43} Appellant presented no evidence at the February 28, 2003, hearing.
 {¶ 44} At the conclusion of the hearing, the trial court took the matter under advisement. As memorialized in a Judgment Entry filed on March 3, 2003, the trial court held that Benjamin Thompson's statements to law enforcement officers were admissible pursuant to Evid.R. 804(B)(6). The trial court specifically found that "[f]rom the testimony presented, the stipulation entered into by the parties, and the documentary evidence introduced, this Court finds by a preponderance of the evidence that the defendant caused the unavailability of Benjamin Thompson for the purpose of preventing Benjamin Thompson from testifying." The trial court, in its entry, further found that the statements were admissible pursuant to Evid.R. 801(C) as proof of motive.
 {¶ 45} A jury trial then commenced on April 28, 2003. On May 1, 2003, the jury found appellant guilty of all charges. The trial court then sentenced appellant to an aggregate sentence of twenty two years to life.
 {¶ 46} Appellant now raises the following assignment of error on appeal:
 {¶ 47} "The trial court committed harmful error in admitting, over the objection of defense counsel, statements attributed to the alleged victim and concerning both the instant offenses and offenses that the state of ohio claimed to be related to the alleged instant offenses."
 I {¶ 48} Appellant, in his sole assignment of error, argues that the trial court erred in admitting at trial, over objection, statements attributed to the alleged victim, Benjamin Thompson. As is stated above, Thompson, in such statements, implicated appellant and his son in various offenses. Appellant now specifically argues that Thompson's statements were clearly hearsay and did not fall within any of the hearsay exceptions. We, however, disagree.
 {¶ 49} As an initial matter, we note that the admission or exclusion of evidence is generally a matter resting within the trial court's sound discretion, and its decision in such matters will not be disturbed on appeal absent an abuse of discretion. State v. Sage (1987),31 Ohio St.3d 173, 510 N.E.2d 343. An abuse of discretion connotes more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 50} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Evid.R. 804 states, in relevant part, as follows: "(B) Hearsay exceptions:
 {¶ 51} "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:[2]
 {¶ 52} "(6) Forfeiture by wrongdoing. A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying. However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement."
 {¶ 53} Division (B)(6) was added by the 2001 amendment to Evid.R. 804 and was patterned on the federal rule, which was adopted in 1997.[3]
2001 Staff Notes to Evid. R. 804. Evid.R. 804(B)(6) "codifies a principle that has been recognized at common-law in Ohio." 2001 Staff Notes to Evid.R. 804.
 {¶ 54} While appellee contends that the trial court incorrectly applied a "preponderance of the evidence" standard rather than a "clear and convincing standard" in determining whether the foundational requirements for Evid.R. 804(B)(6) were met, we disagree. We note that no Ohio cases specifically address Evid. R. 804(B)(6). However, as is stated above, Ohio Evid. R. 804(B)(6) rule was patterned on the federal rule. The majority of Federal Courts of Appeal applying the federal rule have applied a preponderance of the evidence standard. See, for example, UnitedStates v. Cherry, 217 F.3d 811, 820-21 (10th Cir. 2000) and Cotto v.Herbert, 331 F.3d 217, 235 (2d Cir. 2003) (requiring that "the government prove by a preponderance of the evidence that the defendant procured the witness' unavailability"). See also United States v. Scott, 284 F.3d 758,762 (7th Cir. 2002) (applying a preponderance of the evidence standard);United States v. Zlatogur, 271 F.3d 1025, 1028 (11th Cir. 2001) (same);United States v. Price, 265 F.3d 1097, 1103 (10th Cir. 2001) (same);United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999) (same); UnitedStates v. White, 116 F.3d 903, 911 (D.C. Cir. 1997) (same).
 {¶ 55} Furthermore, the 2001 Staff Notes to Ohio Evid.R. 804(B)(6) state that "[t]he trial court decides admissibility under Evid. R. 104(A); the traditional burden of persuasion (preponderance of evidence) rests with the party offering the evidence once an objection is raised." The Staff Notes further note that "[t]he notice requirement . . . may trigger an objection by a motion in limine and the opportunity for determining admissibility at a hearing outside the jury's presence. . . ." This is precisely what happened in the case sub judice.
 {¶ 56} Thus, we must determine whether the State established by a preponderance of the evidence that appellant procured Benjamin Thompson's unavailability for the purpose of preventing him from testifying or attending. "The preponderance of the evidence is defined as the greater weight of the evidence, evidence that is more probable, more persuasive and of greater probative value." Beerman v. City of Kettering (1956),14 Ohio Misc. 149, 159, 237 N.E.2d 644.
 {¶ 57} As is set forth in detail above, testimony was adduced at the February 28, 2003, hearing that a baseball cap with stains found at the scene where Thompson's body was found contained both appellant's and Thompson's DNA. The cap was found approximately ten feet from where Thompson's body was found. Appellant was seen getting out of the white Plymouth Acclaim automobile in Knox County, Ohio, within an hour and a half after the discovery of Thompson's body and a large amount of blood was found inside the car. DNA testing matched the blood on the interior passenger door to Benjamin Thompson.
 {¶ 58} Testimony was also adduced that Thompson previously had implicated appellant and his son in a series of criminal offenses, including arson and insurance fraud, and that, therefore, appellant had a motive to kill Thompson. A newspaper article relating to the offenses was found in Thompson's pocket and two pennies, one heads up and one heads down, were found on his body, indicating that the murder was not a random act. In addition, similar newspaper articles were found on a table in appellant's home.
 {¶ 59} Moreover, testimony was adduced that two .22 caliber Federal live rifle cartridges were found near Thompson's body. When the Plymouth Acclaim was recovered, a .22 caliber cartridge was recovered from the floor board. When questioned about whether there were any similarities between the cartridges found near the body and that found in the car, Detective Brownley testified that they appeared "to be of the same manufacturer, as both had an F head stamp on the cartridge casing, which is demonstrative of Federal Firearms Manufacture" and that the projectiles had the same "copper-type coating" and "seemed to be of the same design of a hollow point design." Transcript of February 28, 2003, hearing at 38. At least one of the projectiles removed from Thompson's body was copper coated. Notably, a .22 caliber Ruger semi-automatic with Federal brand cartridges in it was found in the Acclaim's trunk. The parties stipulated that the two live .22 caliber shells found near Thompson's body and one of the live .22 caliber shells found in the Plymouth Acclaim had "extractor marks that have some similarities with each other indicating that they could have been in the same gun at some point in time . . ."
 {¶ 60} Appellant presented no evidence at the February 28, 2003, hearing.
 {¶ 61} Based on the foregoing, we find that that trial court did not err in admitting at trial, over objection, statements attributed to the alleged victim, Benjamin Thompson, since such statements were admissible pursuant to Evid.R. 804(B)(6). We find that the State established by a preponderance of the evidence that appellant procured Thompson's unavailability to prevent him from testifying before the Grand Jury on June 21, 2002.
 {¶ 62} Moreover, the trial court, in its March 3, 2003, entry, further held that Benjamin Thompson's statements were admissible as non-hearsay under Evid.R. 801(C) as proof of motive as to the murder charge. As is stated above, `"hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" Evid.R. 801(C). Thompson's statements to the police were not presented to prove the matter asserted. Rather, these statements were offered to show appellant's motive to kill Thompson and thus were admissible as non-hearsay with respect to the murder charge.
 {¶ 63} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 64} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.
Edwards, J., Gwin, P.J. and, Boggins, J. concur.
[1] Wiechman did not actually conduct the tests himself, but testified that he had the opportunity to review the testing data and findings. The individual who had actually conducted the tests was on maternity leave.
[2] Evid. R. 804(A)(4) defines unavailability as including when the declarant is unable to testify because of death.
[3] Fed. Evid. R. 804 states, in pertinent part, as follows: "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: 6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."